*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0086p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

JELINI O. DORSEY and KEVIN L. CLARK,
                              *Plaintiffs-Appellees*,

                    *v.*

JOHN BARBER, et al.,

                              *Defendants-Appellants*.

No. 05-4235

---

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 04-02151—James S. Gwin, District Judge.

Argued: October 24, 2006

Decided and Filed: February 21, 2008

Before: GIBBONS and McKEAGUE, Circuit Judges; TARNOW, District Judge.[*]

---

## COUNSEL

**ARGUED:** Nick Tomino, Medina, Ohio, for Appellants. Edward L. Gilbert, SLATER, ZURZ & GILBERT, Akron, Ohio, for Appellees. **ON BRIEF:** Nick Tomino, Medina, Ohio, for Appellants. Edward L. Gilbert, SLATER, ZURZ & GILBERT, Akron, Ohio, for Appellees.

McKEAGUE, J., delivered the opinion of the court, in which GIBBONS, J., joined. TARNOW, D. J. (pp. 13-16), delivered a separate opinion concurring in part and dissenting in part.

---

## OPINION

---

McKEAGUE, Circuit Judge. This case presents civil rights claims against various law enforcement officers for unlawful arrest and use of excessive force. Now before the court is an appeal from an interlocutory order of the district court denying two defendants' motions for summary judgment on the basis of qualified immunity. In particular, the district court held that, due to outstanding questions of fact, defendants Portage County Sheriff's Deputy Duane M. Dawson and Village of Brady Lake Police Officer Allen C. Begin were not entitled to qualified immunity. Both defendants appealed this ruling. Dawson's appeal (No. 05-4234) was dismissed on joint motion of

---

[*]The Honorable Arthur J. Tarnow, United States District Judge for the Eastern District of Michigan, sitting by designation.

the parties on March 2, 2007.  Now, for the reasons that follow, we hold that the district court erred in ruling that Officer Begin is not entitled to qualified immunity.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

The claims against Officer Begin stem from his participation in the temporary detention of plaintiffs Jelini O. Dorsey and Kevin L. Clark, who were identified as suspects in an investigation. As it turned out, plaintiffs were totally and unquestionably innocent of the charges under investigation.  They were released by the police approximately 54 minutes after they were initially stopped by Officer Begin.  In the meantime they had been made to lie face-down on the ground at gunpoint, were handcuffed, and were transported in patrol cars to a police station for identification by an eye-witness.  Begin's role in this sequence of events was not insignificant, but was short-lived.  The question posed by his motion for summary judgment based on qualified immunity is whether a reasonable officer in his position would have known that his conduct violated plaintiffs' civil rights.

On Saturday, October 10, 2004, Officer Begin was assigned to provide traffic control for the Captain Brady Day Parade in the Village of Brady Lake, southeast of Cleveland.  At approximately 10:34 a.m., while driving his police cruiser, he heard a broadcast from the Portage County Sheriff Department instructing all law enforcement officers to "be on the lookout" (a "BOLO") for two suspects wanted by the Ohio State Highway Patrol in connection with an auto theft.  Begin aff. ¶ 5, JA 97.  The suspects were described as "two black males, one with *cornrows*, one wearing a blue jersey and one wearing a white jersey."  Dispatch audiotape tr., JA 873 (italics in original).  They were reported to have last been seen at the intersection of Westshore Drive and Merrill Road in Brady Lake, the very location where Begin happened to be as he heard the BOLO.  *Id*.  The State Highway Patrol was said to have a unit en route to that area.  *Id*.

Moments later, Begin observed two young men who matched the suspects' description walking on Westshore Drive.  Begin aff. ¶ 6, JA 98.  He reported to the sheriff department that he had located the suspects on Westshore.  Dispatch audiotape tr., JA 873; Begin dep. pp. 78-79, JA 544-45.  Begin was told by a Sergeant Faddis to "stop and hold for 67" ("67" being the highway patrol unit that was already en route).  Dispatch audiotape tr., JA 873.  Begin turned his cruiser around and approached the subjects from behind as they walked along the road.  He exited his cruiser and, from a distance of 15-20 feet, told the subjects, plaintiffs Jelini Dorsey and Kevin Clark, to stop.  Begin dep. at 53-57, JA 521-25.  Dorsey and Clark turned around and looked surprised, but continued walking.  *Id*. at 57, JA 525.  Begin called out to them a second time, telling them to stop, put down the clipboards they were carrying, and lie down on the ground.  *Id*.  They still looked surprised.  *Id*.  Again, Begin told them to put down the clipboards and get down on the ground. Dorsey and Clark objected, asking why, and saying they hadn't done anything wrong.  *Id*. at 58, JA 526.[1]

Because they remained noncompliant, disregarding two orders, Begin drew his service weapon from its holster to control the situation until a back-up unit arrived:  "At that time I felt the best way to contain them from walking away or doing anything is to have them lay on the ground with their hands spread out."  *Id*. at 59-60, JA 527-28.  As Dorsey and Clark continued to object, Begin told them everything would be explained shortly.  He ordered them a third time, weapon drawn, to get down on the ground.  *Id*. at 62-63, JA 530-31.  This time they obeyed.  *Id*. at 63.  Begin instructed them to lie on their stomachs with hands outstretched over their heads.  Begin continued to display his firearm until back-up arrived, in the person of Lieutenant Duane Dawson of the

---

[1]As it turned out, Dorsey and Clark were college students employed by the "America Coming Together" voter registration project and were attending the parade to register citizens to vote.  They tried to explain this to Begin, but he refused to listen.

Portage County Sheriff Department, at approximately 10:36 a.m. Dawson then handcuffed Dorsey and Clark, and Begin holstered his weapon. *Id*. at 63-64, JA 531-32.

On his arrival, Dawson took control of the scene. *Id*. at 68-69, JA 536-37. Dorsey and Clark remained handcuffed, lying on their stomachs until the highway patrol unit arrived, eight to ten minutes later. *Id*.[2] According to the sheriff department dispatch radio log report, Highway Patrol Trooper Lindsey Woodward arrived at the scene at 10:41 a.m. Feigert dec. ¶ 8, JA 151. By 10:48 a.m., both suspects were being transported—Clark in Woodward's patrol car and Dorsey in Dawson's—to the highway patrol post in nearby Ravenna. *Id*. at ¶ 9, JA 151. They arrived at the Ravenna Post by 11:03 a.m. *Id*. at ¶ 10, JA 151.

There they were shown to Robert Robinson, a concerned citizen who had provided a description of the suspects that became the subject of the BOLO. Robinson statement, JA 182-86. At approximately 8:00 a.m. that morning, Robinson had picked-up two "nervous" African-American hitch-hikers (one being about 20 years old and the other about 15 years old) in the area where two stolen cars had been abandoned after their drivers had eluded a high-speed police chase at approximately 6:15 a.m. As Robinson traveled in a westerly direction toward Ravenna, he happened to drive past each of the two abandoned cars. A state highway patrol cruiser was parked at the site of each abandoned car. As he passed each site, Robinson noticed that his young passengers "began to panic." Robinson statement, JA 182. On passing the second abandoned car, he observed that the "younger boy got scared and was breathing heavy." *Id*. Robinson drove his passengers to Ravenna, in the direction of Brady Lake, where he dropped them off. Shortly thereafter, Robinson reported his observations to the state highway patrol at its Ravenna post.

Robinson's description of the two hitch-hikers was arguably consistent with observations made by State Highway Patrol Trooper Charles Mendenhall, who, at about 6:15 a.m., had encountered two red Dodge Neons traveling side-by-side and speeding toward him. Mendenhall statement, JA 171; Mendenhall investigation report, JA 404. Mendenhall initially gave chase to the Neon that had almost collided with his patrol car. He noted that the driver of that vehicle was "a black male with a white t-shirt and and a light colored hat or dew rag on his head." Mendenhall statement, JA 171. Mendenhall terminated the pursuit, which had reached speeds of 90-95 mph, because hills and curves made for hazardous conditions. Shortly thereafter, both Neons were found to be abandoned at different locations in the vicinity. Both were determined to be stolen.

Robinson's report of having encountered two young black men on foot in the vicinity of the area where the cars had been abandoned less than two hours earlier, who reacted with visible nervousness on passing the vehicles, was deemed to be possibly related to Mendenhall's earlier encounter. Hence, Robinson's report gave rise to the initial BOLO, which included his description of the subjects. However, when Robinson viewed Dorsey and Clark at the highway patrol post, he confirmed that they were *not* the same young men he had picked up earlier in the day. That they happened to be black males of about the same ages as, and dressed similarly to, the hitch-hikers he had picked up appears to have been merely an unfortunate coincidence. Dorsey and Clark were released at 11:28 a.m. and returned to Brady Lake. Investigation report, JA 408.

Barely three weeks later, plaintiffs commenced this action, filing their four-count complaint in the Northern District of Ohio. Named as defendants are five named and other unnamed police officers as well as several municipal, county and state governmental entities. The only claims relevant for present purposes are plaintiffs' civil rights claims under 42 U.S.C. § 1983 that Officer

---

[2]Although Dorsey and Clark do not *materially* dispute Begin's version of these facts, they contend they were forced to lie on the ground handcuffed for at least 20 minutes. Dorsey aff. ¶ 10, JA 598; Clark aff. ¶ 10, JA 596. This time-discrepancy is immaterial to the question of Begin's liability because, by the time Dorsey and Clark were handcuffed, control of the scene had passed from Begin to Dawson.

Begin unlawfully detained and arrested them and used excessive force in the process. The district court denied Begin's motion for summary judgment on the basis of qualified immunity, finding there to be questions of fact regarding the objective reasonableness of Begin's conduct. On appeal, Begin insists that, even accepting plaintiffs' allegations as true, he is entitled to qualified immunity because, considering the information that he possessed at the time of his encounter with plaintiffs, a reasonable officer in his position could have believed that he was justified in conducting an investigatory stop and that his use of a firearm to effectuate the two-minute detainment (until control of the scene was assumed by a superior officer) was not violative of plaintiffs' clearly established civil rights.

## II. ANALYSIS

### A. Standard of Review

We review a district court's denial of qualified immunity *de novo*. *Gregory v. City of Louisville*, 444 F.3d 725, 742 (6th Cir. 2005). The appeal of a denial of qualified immunity at summary judgment is an interlocutory appeal that we hear as a final decision of the district court under 28 U.S.C. § 1291 pursuant to the "collateral order" doctrine. *Id.* (citing *Forsyth v. Mitchell*, 472 U.S. 511, 525-27 (1985)). We may only review the denial of qualified immunity to the extent that the "appeal involves the abstract or pure legal issue of whether the facts alleged by the plaintiff constitute a violation of clearly established law." *Id.* (quoting *Berryman v. Rieger*, 150 F.3d 561, 563 (6th Cir. 1998)).

> If . . . the defendant disputes the plaintiff's version of the story, the defendant must nonetheless be willing to concede the most favorable view of the facts to the plaintiff for purposes of the appeal. Only if the undisputed facts or the evidence viewed in the light most favorable to the plaintiff fail to establish a *prima facie* violation of clear constitutional law may we decide that the defendant is entitled to qualified immunity on an interlocutory appeal.

*Berryman*, 150 F.3d at 563 (citations omitted).

Hence, although the district court couched its ruling in terms of factual disputes, the pure legal issue legitimately before us on appeal concerns whether Begin's display of his firearm in conjunction with ordering plaintiffs to lie face-down on the ground for a period of time undisputedly no greater than two minutes—until additional law enforcement support arrived and control of the scene was assumed by a superior officer—constituted an unreasonable seizure or an excessive use of force in violation of plaintiffs' clearly established rights, of which a reasonable officer would have known. *See Smoak v. Hall*, 460 F.3d 768, 777 (6th Cir. 2006) (recognizing propriety of interlocutory appeal notwithstanding district court's fact-based rationale where defendant-appellant accepts plaintiff's version of facts for purpose of presenting a "neat abstract issue of law").

### B. Qualified Immunity Standard

In order to prevail on a civil rights claim under 42 U.S.C. § 1983, plaintiffs must establish that a person acting under the color of state law deprived them of a right secured by the Constitution or laws of the United States. *Smoak*, 460 F.3d at 777. Plaintiffs must also overcome the defense of qualified immunity, which shields government officials from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

In determining whether qualified immunity applies, we employ a two-part test, asking "(1) whether, considering the allegations in a light most favorable to the party injured, a

constitutional right has been violated, and (2) whether that right was clearly established." *Id.* (quoting *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310-311 (6th Cir. 2005). "The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct." *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2001)). The doctrine protects "all but the plainly incompetent or those who knowingly violate the law." *Humphrey v. Mabry*, 482 F.3d 840, 847 (6th Cir. 2007) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Plaintiffs have the burden of demonstrating that Officer Begin is not entitled to qualified immunity. *Id.* at 846.

## C. Unreasonable Seizure

### 1. *Reasonable Suspicion?*

Plaintiffs allege they were victims of an unreasonable seizure, i.e., that Officer Begin did not have reasonable suspicion to justify stopping them in the first place, and that the manner in which he conducted the seizure was unreasonable because he used more intrusive means than were necessary under the circumstances.    The Fourth Amendment secures our freedom from "unreasonable searches and seizures."  A person is "seized" by a law enforcement officer when, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Smoak*, 460 F.3d at 778 (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)).  When an officer has "reasonable suspicion" that criminal activity may be afoot, the officer may conduct a limited seizure and briefly detain a person for investigative purposes. *Terry v. Ohio*, 392 U.S. 1, 30-31 (1968). "Reasonable suspicion" is an abstract concept:

> It requires more than a mere hunch, but is satisfied by a likelihood of criminal activity less than probable cause, and falls considerably short of satisfying a preponderance of the evidence standard.  If an officer possesses a particularized and objective basis for suspecting the particular person of criminal activity based on specific and articulable facts, he may conduct a *Terry* stop.  Courts must examine the totality of the circumstances to determine whether reasonable suspicion existed to justify a *Terry* stop.

*Smoak*, 460 F.3d at 778-79 (quotation marks and citations omitted).

In examining the totality of the circumstances, it is important to note that the officer's reasonable suspicion need not arise exclusively from his own direct observations.  Rather, it can be derived from such sources as informant tips, dispatch information, and directions from other officers. *Id.* at 779 (citing *United States v. Hensley*, 469 U.S. 221, 231-32); *Humphrey*, 482 F.3d at 848-49. "A seizure conducted in reliance on a flyer or dispatch does not violate the Fourth Amendment if the law enforcement officer who issued the information possessed the necessary reasonable suspicion." *Smoak*, 460 F.3d at 779.  Elaborating on this point, the Supreme Court  has explained:

> [I]f a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person had committed an offense, then reliance on the flyer or bulletin justifies a stop to check identification . . . , to pose questions to the person, or to detain the person briefly while attempting to obtain further information.  . . . .  If the flyer has been issued in the absence of a reasonable suspicion, then a stop in the objective reliance upon it violates the Fourth Amendment.  In such a situation, of course, the officers making the stop may have a good-faith defense to any civil suit.

*Hensley*, 469 U.S. at 232 (citations omitted).  Hence, in a case such as this, "where one officer's claim to qualified immunity from the consequences of a constitutional violation rests on his asserted good faith reliance on the report of other officers, we consider:  (1) what information was clear or

should have been clear to the individual officer at the time of the incident; and (2) what information that officer was reasonably entitled to rely on in deciding how to act, based on an objective reading of the information." *Humphrey*, 482 F.3d at 848.

The district court summarily concluded that plaintiffs' clearly established right to be free from unreasonable seizure was violated because nothing in the BOLO heard by Officer Begin could be construed to give rise to reasonable suspicion sufficient to support stopping plaintiffs. The district court went on to observe that even if the BOLO *were* deemed to have given rise to reasonable suspicion, it justified only a brief detention, to make inquiry of plaintiffs regarding their identities and their reasons for being at the parade. Because Officer Begin and Lieutenant Dawson, collectively, were allegedly responsible for detaining plaintiffs as long as twenty minutes, a period of time that exceeded the justified scope of detention, the district court concluded there was at least a question of fact regarding the reasonableness of the seizure. The district court held this question of fact also precluded a holding that Begin was entitled to qualified immunity.

The district court's reasoning is flawed in two respects. First, in relation to its reasonable suspicion determination, the district court failed to give due regard to Begin's right to rely on dispatch information and direction from other officers. Second, in evaluating Begin's entitlement to qualified immunity, the court failed to consider his role in the encounter individually.

Police officers may rely on police bulletins or flyers to detain persons based on reasonable suspicion that criminal activity is afoot "to whatever extent the bulletin itself was based on articulable facts that would support reasonable suspicion." *Feathers v. Aey*, 319 F.3d 843, 849 (6th Cir. 2003)(citing *Hensley*, 469 U.S. at 232). In this case, plaintiffs insist that the BOLO heard by Begin was not based on articulable facts supporting reasonable suspicion.

The BOLO description heard by Begin—"two black males, one with *cornrows*, one wearing a blue jersey and one wearing a white jersey"—was derived most immediately from the observations of Portage County Park Ranger John Barber at the scene of the Brady Lake parade. At approximately 10:15 - 10:25 a.m. on July 10, 2004, Barber had heard a BOLO announcing that "the State Patrol was looking for two black males dressed in sports clothing involved in an incident of a stolen vehicle in a crash." Barber dep. p. 41, JA 281. Within 10 minutes thereafter, he saw two African-American males wearing sports clothing—the only two African-Americans among the hundreds of people along the parade route—on Westshore Boulevard just north of Merrill Road in Brady Lake. The two black males were not running or acting suspiciously. Barber called the state highway patrol post in Ravenna and reported his sighting of the two black males in sports clothing. *Id*. at 52-55, JA 287-90.

The state highway patrol dispatcher relayed this information to the Portage County Sheriff Department, which in turn, issued the BOLO heard by Begin. Dispatch log, JA 189. Although Barber, when deposed, could not remember giving a description any more detailed than that the two black males were wearing sports clothing, the BOLO subsequently issued by the sheriff department and heard by Begin included substantially the same description that Robinson had given to the state highway patrol dispatcher hours earlier: "two black men . . . one had cornrows in his hair and was wearing dark jersey, the other was wearing a white shirt and shorts." *Id*.

Was the BOLO issued by the Portage County Sheriff Department, derived from the recent observations of Park Ranger Barber as well as the earlier observations of Robert Robinson and Trooper Mendenhall, "issued on the basis of articulable facts supporting a reasonable suspicion" that plaintiffs, who generally matched the description in the BOLO, had been involved in the earlier speeding, high-speed chase, and abandonment of stolen vehicles? We conclude that it was. Plaintiffs argue to the contrary, contending (1) that they were stopped in a totally different area from where the stolen cars were abandoned; (2) that the description contained in the BOLO was too vague; and (3) that they were not doing anything suspicious when they were stopped, but were encouraging their fellow citizens to vote.

Addressing these objections in turn, first, we acknowledge that plaintiffs were stopped several miles west of Ravenna, whereas the stolen vehicles were abandoned several miles east of Ravenna four hours earlier. Yet, the location of their seizure in Brady Lake is entirely consistent with the movement, actual and anticipated, of the hitch-hikers Robinson picked up east of Ravenna and dropped off in Ravenna. Brady Lake, being west of Ravenna, is along the way to Akron, which according to Robinson, was the hitch-hikers' desired destination and the direction in which they walked after he dropped them off. Robinson statement, JA 182-86. In other words, considering that offenders are generally not inclined to stay put at the site of their crime, the location of plaintiffs' seizure at about 10:34 a.m. (a mere four hours after abandonment of the vehicles), being entirely consistent with the suspects' anticipated movement (i.e., anticipated as a result of Robinson's report, as of 8:00 a.m.), actually supports the finding of reasonable suspicion.

Second, we also agree with plaintiffs' observation that the amount of detail in the suspects' descriptions in the BOLO left much to be desired. Yet, unhappily for plaintiffs, the few details that were provided by witness Robinson, and repeated in the BOLO heard by Officer Begin, happened to closely match plaintiffs' appearance when Begin identified them along the parade route: two young black males, one with corn rows, and one wearing a blue jersey and one wearing a white jersey. Begin dep. p. 73, JA 539. Thus, again, although the physical description of the suspects provided in the BOLO and relied on by Begin was not definitive, the available details supported the formation of reasonable suspicion that plaintiffs were the same two young black males who Robinson had picked up and who had reacted so suspiciously when they passed the scenes of the abandoned stolen cars.

Third, we acknowledge that plaintiffs were not acting suspiciously when they were first observed by Begin. Yet, the notion that fleeing offenders might try to avoid detection by attempting to blend inconspicuously into a large crowd is not implausible. In other words, plaintiffs' unsuspicious behavior does not necessarily overrule the significance of the other articulable indicia of reasonable suspicion. Certainly, the other articulable facts that prompted the BOLO justified a brief investigatory stop. Moreover, after spotting the two black males who matched the BOLO description, Begin did not precipitously conduct a *Terry* stop based on the BOLO alone. Rather, he took the further step of contacting the sheriff department and requesting directions from the BOLO-issuing agency, which was presumptively more familiar with the facts supporting the BOLO and the current status of the investigation and was in a better position to assess reasonable suspicion. Only after receiving direction from Sergeant Faddis to "stop and hold" did he effectuate the stop.

The instant facts are materially indistinguishable from those found sufficient to establish reasonable suspicion in *Smoak*, 460 F.3d at 774-75, 780. In *Smoak*, a *Terry* stop was conducted based on a state highway patrol BOLO announcement of an identified witness's report of a green station wagon speeding down the interstate with money flying out of it. A second BOLO mentioned that the station wagon may have been involved in a robbery. Responding to the BOLOs, a state trooper followed the station wagon for some eight miles and observed no suspicious behavior. Before pulling the vehicle over, the trooper requested direction from the local highway patrol post and was directed to stop the vehicle. After the stop was effectuated, in a none-too-gentle manner,

the Smoak family occupying the station wagon was found to be totally innocent of any wrongdoing. Based on the totality of the circumstances, the court held that the troopers had a reasonable suspicion sufficient to conduct a *Terry* stop.  *Id*. at 780.

Here, we reach the same conclusion, finding that the BOLO heard by Begin, together with Sergeant Faddis's order to stop the suspects and hold them until the State Highway Patrol unit arrived, were based on articulable facts supporting reasonable suspicion.[3]  It follows that Begin's act of stopping plaintiffs, in reliance on the BOLO and the "stop and hold" order, did not violate their Fourth Amendment rights. To the extent plaintiffs' unreasonable seizure claim against Begin is based on an asserted lack of reasonable suspicion, Begin is therefore entitled to qualified immunity.

### 2.  *Unlawful Arrest?*

Plaintiffs also contend, and the district court agreed, that even if the *Terry* stop is deemed to have been supported by reasonable suspicion, the seizure was carried out in an unreasonable manner, amounting to a *de facto* arrest without probable cause.   Indeed, a *Terry* stop must be "reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Perez*, 440 F.3d 363, 372 (6th Cir. 2006) (quoting *Terry*, 392 U.S. at 20). The detention "must be temporary and last no longer than is necessary to effectuate the purpose of the stop."  *Id*. (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)).  "The investigative means used should also be the least intrusive means reasonably available to verify or dispel the officer's suspicions in a short period of time."  *Id*.

When the nature of a seizure exceeds the bounds of a permissible investigative stop, the detention may become an arrest that must be supported by probable cause. *Smoak*, 460 F.3d at 780-81.  Yet, there is no litmus test for determining when the line is crossed.  We consider such factors as the length of the detention, the manner in which it is conducted, and the degree of force used in determining whether an investigative stop is reasonably related to the basis for the original intrusion. *Id*. at 781.

The district court concluded that this detention was unreasonable, or at least that a question of fact was presented, and that Officer Begin was not immune from liability for it.  In its analysis, the district court did not distinguish between the actions of Officer Begin and Lieutenant Dawson, but lumped them together.  Most significant in the district court's reasoning were plaintiffs' allegations that during the time they were held at gunpoint, handcuffed and face-down on the pavement, the officers did not even ask them questions designed to confirm or dispel suspicions. It is undisputed, however, that Begin was responsible only for the first two minutes of the stop; thereafter, Lieutenant Dawson had arrived and assumed responsibility.[4]  During the first two minutes, Begin, reasonably relying on, and carrying out, the "stop and hold" order he received from the sheriff department, brandished his firearm to secure compliance only after plaintiffs had disregarded his first two commands.  In other words, inasmuch as Begin's first two lawful

---

[3]This case is factually distinguishable from *Feathers v. Aey*, 319 F.3d 843 (6th Cir. 2003).  In *Feathers*, the court held that dispatch information based on an unsubstantiated anonymous tip from a tipster who offered no evidence of reliability was not sufficient to support a finding of reasonable suspicion.  *Id*. at 848-50.  Here, in contrast, witness Robinson was not anonymous.  He not only identified himself, but left his phone number with the dispatcher so that he could be contacted for more information if necessary.  Moreover, his reported encounter with the hitch-hikers and observations of their demeanor were consistent with and complemented Trooper Mendenhall's report of his experience earlier in the day.  Here, considering the totality of the circumstances,  the articulable facts within the collective knowledge of the officers more strongly supported reasonable suspicion than the facts presented in *Feathers*.

[4]Each defendant's liability must be assessed individually, based on his or her own actions. *See Ghandi v. Police Dep't of the City of Detroit*, 747 F.2d 338, 352 (6th Cir. 1984).

commands had gone unheeded, he reasonably perceived that a show of force was necessary to secure compliance. He ordered plaintiffs to lie face-down on the pavement, believing that was the best way to stabilize the situation until more law enforcement support arrived. When Dawson arrived, two minutes later, Dawson applied handcuffs, permitting Begin to holster his weapon, as they waited for the highway patrol unit to arrive.

Did Begin violate plaintiffs' clearly established Fourth Amendment rights by displaying his firearm and ordering them to lie on the ground for two minutes? It is well-recognized that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989). "During a *Terry* stop, officers may draw their weapons or use handcuffs 'so long as circumstances warrant that precaution.'" *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 309 (6th Cir. 2005) (quoting *Houston v. Clark County Sheriff Deputy John Does 1-5*, 174 F.3d 809, 815 (6th Cir. 1999)). Viewing the situation with hindsight, it is clear that plaintiffs were innocent of any wrongdoing and that none of the coercive measures were actually necessary. Yet, it is not for us to judge the reasonableness of a particular use of force with the benefit of 20/20 hindsight. Rather, we are to judge it from the perspective of a reasonable officer on the scene. *Williams v. City of Grosse Pointe Park*, 496 F.3d 482, 486 (6th Cir. 2007).

In assessing reasonableness, we acknowledge "that police officers are often forced to make split second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id*. (quoting *Graham*, 490 U.S. at 396-97). "The reasonableness of a particular use of force requires careful attention to the facts and circumstances of each particular case, including: (1) the severity of the crime at issue, (2) the immediacy of the threat posed by the suspect to the officers or others, and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Id*. (quoting *Graham*, 490 U.S. at 396) (interior quotation marks omitted).

Applying these standards, we have no trouble concluding that Begin made a mistake. Considering that the suspects were wanted in connection with an auto theft investigation,[5] and that plaintiffs did not manifestly pose an immediate threat to anyone's safety or a risk of flight, Begin should have been able to "stop and hold" them without brandishing his firearm and ordering them to lie face-down on the pavement. Begin's response to the apparent demands of the situation seems to have been exaggerated and the resultant seizure, though supported by reasonable suspicion, was, due to the unnecessarily intrusive means employed by Begin, at least arguably unreasonable.[6]

Yet, it does not follow that Begin's mistake necessarily disqualifies him from qualified immunity. Qualified immunity protects "all but the plainly incompetent or those who knowingly

_____

[5]There is no evidence that Begin was aware that at least one of the suspects had earlier fled the police and forced Trooper Mendenhall to pursue him in a high-speed chase.

[6]Unlike the district court, we are not troubled by Begin's failure to ask plaintiffs any questions during the two-minute period he detained them. The district court faulted Begin for not asking them what they were doing in the area or what they had been doing earlier, questions that, the district court speculated, "surely would have dispelled suspicion that plaintiffs were involved in the car theft." This line of reasoning ignores the fact that Begin stopped the plaintiffs not because *he* had personally formed a reasonable suspicion of criminal activity, but because he was reasonably relying on the assessment of other officers, together with the order to stop and hold. Inasmuch as he was unfamiliar with the state of the ongoing investigation, he was in no position to dispel or confirm suspicions. His job was to stop and hold—until a trooper conversant with the investigation arrived to pursue appropriate means of dispelling or confirming suspicions. Until Dawson arrived and assumed responsibility for the detention, Begin had no prerogative to release plaintiffs on the basis simply of their answers to his questions. It was, therefore, not unreasonable for Begin to refrain from asking plaintiffs questions or to disregard their protestations of innocence during the short time he was responsible for their detention.

violate the law." *Humphrey*, 482 F.3d at 847. There is no support for the notion that Begin knowingly and deliberately violated plaintiffs' right to be free from unreasonable seizure. Nor can his mistake be fairly characterized as so egregious as to suggest outright incompetence. At worst, Begin made an error of judgment, erring on the side of public safety. Not knowing the seriousness of the criminal activity for which the suspects were wanted, but knowing that the persons before him, who matched the BOLO description, had first disregarded and then resisted his orders to stop, Begin chose to stabilize the situation by acting with a preemptive show of authority. This approach turned out to be unnecessary, but cannot be said to have been plainly incompetent or objectively unreasonable. *See Maryland v. Wilson*, 519 U.S. 408, 414 (1997) (recognizing that risk of harm to police and others during a traffic stop is minimized if officers routinely exercise unquestioned command of the situation). When Begin confronted plaintiffs, they were among a crowd of people. Had he equivocated in response to their challenge to his authority, tensions might quickly have escalated into a confrontation difficult to manage without the *use* of force, as opposed to a mere show of force. By acting firmly and without hesitation, Begin appears to have acted in the good faith belief that he was minimizing the risk of harm.

The conclusion that Begin is, despite his mistake, nonetheless entitled to qualified immunity is supported by other recent Sixth Circuit rulings. In *Smoak*, 460 F.3d at 782, although officers' use of guns and handcuffs in conducting a *Terry* stop was held to be overly intrusive, the officers were deemed protected by qualified immunity because the right to freedom from such coercive measures had not been so clearly established by prior case law. Similarly, in *Humphrey*, 482 F.3d at 849, officers who reasonably relied on confused information in forcibly removing an innocent suspect from his car at gunpoint and handcuffing him were also held to be protected by qualified immunity. In both cases, the district court's denial of qualified immunity was reversed.

Here, too, even upon viewing the facts in the light most favorable to plaintiffs, we cannot say that no reasonably competent officer in Begin's position would have thought that his actions were justified. *See Humphrey*, 482 F.3d at 847 (noting that qualified immunity should be recognized if officers of reasonable competence could disagree on the legality of the action). Hence, viewing the situation from the perspective of a reasonable officer in Begin's shoes and applying due deference to the exercise of law enforcement discretion, we hold that he is entitled to qualified immunity even though the means he used to initially effectuate the *Terry* stop may have been more intrusive than necessary.[7]

### 3. *Excessive Force?*

Plaintiffs also contend the means used by Begin to effectuate the arrest were unreasonable in that he used excessive force. Under the Fourth Amendment, individuals have a right to be free of excessive force when police make an arrest or seizure. *Graham*, 490 U.S. at 394-95. The standards governing this unreasonable seizure claim are essentially the same as those set forth above in connection with plaintiffs' claim that they were subjected to a *de facto* arrest because the means used were more intrusive than necessary. *See Williams*, 496 F.3d at 486; *Humphrey*, 482 F.3d at 849; *Smoak*, 460 F.3d at 783. Determining whether a use of force was unreasonable and therefore excessive requires "a 'careful balancing' of the individual interest in being free from unreasonable seizures and the governmental interest in protecting the safety of its peace officers and the public." *Williams*, 496 F.3d at 486 (citing *Graham*, 490 U.S. at 396). Again, we consider the facts and

---

[7]The district court's contrary conclusion is premised in part on the fact that plaintiffs were unnecessarily handcuffed and left lying on the ground until Trooper Woodward arrived, some 10-20 minutes after the *Terry* stop began. It is undisputed, however, that responsibility for the temporary detention had passed from Begin to Lieutenant Dawson when Dawson arrived. It was Dawson who cuffed plaintiffs and made the decision to leave plaintiffs on the ground. While these measures *may* have been more intrusive than necessary, they are not actions for which Begin, a subordinate officer who remained present at the scene, can be held liable.

circumstances of the particular case, including (1) the severity of the crime, (2) the immediacy of the threat posed by the suspects, and (3) whether the suspects were actively resisting or attempting to evade arrest. *Id.* "This standard contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Smoak*, 460 F.3d at 783 (quoting *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002)).

Plaintiffs claim that Begin used excessive force when he ordered them to the ground at gunpoint and held them there despite their unsuspicious, nonthreatening behavior. The district court held that the level of force used by Begin was at least arguably excessive. For the reasons set forth above, we do not disagree. *See Pray v. City of Sandusky*, 49 F.3d 1154, 1159 (6th Cir. 1995) (holding that officers' mistake in forcing innocent suspects to the floor at gunpoint could be deemed excessive). Yet, for the reasons also set forth above, we hold that Begin is nonetheless entitled to qualified immunity on this claim, too.

In reaching this conclusion, we find additional guidance in several recent Sixth Circuit rulings. In *Pray*, for instance, a question of fact defeated the defendants' invocation of qualified immunity because there was evidence potentially supporting the finding that defendant officers "manhandled" the elderly plaintiffs in their home by forcing them to the floor, causing physical injuries, *after* having become aware that they were searching the wrong residence. *Id.* at 1159-61. Here, in contrast, it is undisputed that neither Begin nor any other officer involved became aware that plaintiffs were not the suspects wanted in connection with the auto thefts until Robinson confirmed this, long after Begin's two-minute role in the detention had been completed.

The instant facts are also materially distinguishable from those presented in *Smoak*, where the defendant officers were denied qualified immunity on an excessive force claim. In *Smoak*, the defendants had pulled-over a vehicle whose occupants were innocent of any wrongdoing. In the course of the *Terry* stop, the defendants forcibly subdued one of the plaintiffs, who was handcuffed and otherwise compliant, when he jumped up in horror upon seeing an officer shoot and kill the family dog. The defendants allegedly "knocked his legs out from under him, and threw him to the pavement face-first," causing injuries that required surgery. 460 F.3d at 783. The court affirmed the denial of qualified immunity on the excessive force claim, holding that the alleged use of force, if proved, was not reasonable. Here, in contrast, the alleged "force" implicated by the excessive force claim against Begin does not even approach this level. It was rather a mere *show* of force that did not result even in his touching of plaintiffs, much less any physical injury. We cannot hold that no reasonable officer in Begin's position would have thought such actions justified under the circumstances of this case.

The instant facts are more analogous to those presented in *Humphrey*, where qualified immunity was granted to officers who forcibly removed the innocent plaintiff from his vehicle at gunpoint, conducted a pat-down, and partially handcuffed him. 482 F.3d at 849. Noting that the plaintiff was not harmed, the court held that, considering the information they relied on, the defendants could have reasonably believed that their conduct was lawful, not a use of excessive force. Here, too, the reasonableness of Begin's conduct must be measured in light of the limited information on which he reasonably relied. While we acknowledge that the means used by Begin were more intrusive than necessary, a reasonable officer in his shoes could certainly believe that his actions—brandishing a firearm and ordering two suspects (who were wanted by the state highway patrol and who had twice disregarded his lawful commands to stop) to lie on the ground for a period of two minutes, without firing the weapon or physically injuring them in any way or even touching them—were not violative of the suspects' constitutional rights. The contours of the right to freedom from the use of excessive force were not so clearly established in a particularized sense that a reasonable officer would have known that such conduct was unlawful. *See Brosseau v. Haugen*, 543 U.S. 194, 198-99 (2004) (making it clear that, to overcome qualified immunity, the right allegedly violated must be shown to have been clearly established in a particularized and relevant sense).

Accordingly, we conclude that defendant Begin is entitled to qualified immunity on plaintiffs' excessive force claim as well.

### III.  CONCLUSION

Based on the foregoing analysis, we hold that the district court erred when it denied defendant Begin's motion for summary judgment on plaintiffs' claims that Begin unlawfully detained and arrested them and used excessive force in the process.  The district court's judgment is in this respect **REVERSED** and the matter is **REMANDED** to the district court for entry of judgment in favor of defendant Begin.

---

**CONCURRING IN PART, DISSENTING IN PART**

---

TARNOW, District Judge, concurring in part and dissenting in part. I concur in the court's decision on the *Terry* stop but respectfully dissent from its ruling on plaintiffs' claims of excessive force and unlawful arrest.

I. *Terry* stop in reliance on dispatch

The majority concludes that defendant Begin did not violate the Fourth Amendment when he stopped Dorsey and Clark. I disagree. Nevertheless, because Begin executed the stop in good-faith reliance on the dispatch, he is entitled to qualified immunity as to the *Terry* stop.

It is a factually intensive question whether there was a constitutional violation. Such an inquiry would need to examine (1) whether Officer Barber's report identifying Dorsey and Clark as the suspects was unwarranted, as Barber had picked them out – in response to the dispatch he had heard – based on the generic, overly broad characteristic that they were two black men wearing sports clothing. Next, the constitutional analysis under *United States v. Hensley*, 469 U.S. 221, 232-33 (1985), would require one to consider (2) whether Barber's unwarranted report left the Portage County Sheriff Department dispatcher without enough of a basis in articulable facts to support reasonable suspicion, thus rendering Begin's stop in reliance on the dispatch unconstitutional.

In concluding that Begin's stop was indeed based on reasonable suspicion, the majority's reliance on *Smoak v. Hall*, 460 F.3d 768 (6th Cir. 2006), is misplaced. Majority opinion at 8. *Smoak*'s ruling on reasonable suspicion is distinguishable from the instant case, because the dispatcher in *Smoak* had warranted facts pointing to a possible crime. In *Smoak*, a witness had called the state highway patrol when she saw a green station wagon cruising down the highway with money flying out of it. Troopers met her at the scene and reported to the dispatcher that "they found a lot of loose currency." *Id.* at 774. Without any basis in fact, subsequent BOLOs indicated that the green station wagon may have been involved in an armed robbery. *Id.* at 780. The stopping officers relied on these BOLOs, and conducted a highly intrusive felony stop. With regard to reasonable suspicion, the *Smoak* panel merely determined that the dispatchers had reasonable suspicion "that some mishap had occurred." *Id.* at 780. And of course the dispatchers did have this suspicion, because there was a witness report of lots of money flying out of a car, and this report was verified by state troopers. *Smoak* held that the dispatcher had enough articulable facts to support a reasonable suspicion that something was up. But *Smoak* did not say that there were enough facts to support reasonable suspicion of anything more than a mishap. In contrast, the dispatch targeting Dorsey and Clark had a weak basis in objectively warranted facts for the reasons already suggested.

In the end, though, whether there actually was a constitutional violation is a question that the court does not need to resolve. Even assuming that the dispatch that Begin relied upon was issued unconstitutionally, Begin has a "good-faith defense" to Dorsey and Clark's suit, because he "defensibly act[ed] in reliance" on the "be on the look out" dispatch (BOLO) issued by the Portage County Sheriff Department. *See Hensley*, 469 U.S. at 232-33.

In particular, the court is to examine "(1) what information was clear or should have been clear to the individual officer at the time of the incident; and (2) what information that officer was reasonably entitled to rely on in deciding how to act, based on an objective reading of the information." *Humphrey v. Mabry*, 482 F.3d 840, 848 (6th Cir. 2007). This is an easy issue, because the description of the clothes and physical attributes in the BOLO that Begin heard did in fact match what he observed about Clark and Dorsey, because Robinson's description was incorporated into the dispatch issued by the Portage County Sheriff Department. *See* District court

opinion at 7, JA 35 (one of the plaintiffs was wearing a light blue t-shirt, black pants, a white do-rag, and white tennis shoes, and had cornrows in his hair, while the other was wearing a white t-shirt, yellow or white shorts, a black baseball cap, and white tennis shoes). The information in the BOLO was clear and provided a reasonable basis for Begin to identify Clark and Dorsey as the men announced in the dispatch. Therefore, I ultimately concur in the majority's decision that Begin is entitled to qualified immunity regarding the *Terry* stop.

## II. Excessive force

The majority concludes that although Begin's show of force was arguably excessive, he acted in an objectively reasonable manner, given the facts and circumstances he confronted. I respectfully dissent.

### A.  Two segments

For the excessive force analysis in this case, it is helpful to carve Officer Begin's actions into two segments. The first segment consists of the two minutes from the moment Begin confronted plaintiffs to just before the time of Dawson's handcuffing. The time following Dawson's handcuffing through Trooper Woodward's appearance on the scene comprises the second segment. As the district court noted, Dorsey and Clark contend that Begin "continued to point his weapon for an unspecified of time" even after they were handcuffed until Trooper Woodward arrived to take them to the police station. District court opinion at 8-9, JA 36-37. Begin, on the contrary, says he holstered his gun once Dawson finished handcuffing Clark and Dorsey. Begin aff. ¶ 7, JA 98. For this appeal, the court must credit plaintiffs' version of the facts. *Berryman v. Rieger*, 150 F.3d 561, 563 (6th Cir. 1998).

### B.  Second segment

With regard to the second segment, it would not have been reasonable for an officer to continue pointing his gun at the plaintiffs. Because the plaintiffs were already handcuffed, there was no reason to subject them to the threat embodied in keeping the gun drawn. Nor does qualified immunity shield Begin's post-handcuffing show of force, because no reasonable officer would find it necessary to employ such an overly intrusive level of force.

### C.  First segment

As for the first segment, this presents a somewhat closer question, because, as the majority states, Begin was only in charge of the situation for a mere two minutes. Nonetheless, the majority decides that the facts-and-circumstances analysis under *Graham v. Connor*, 490 U.S. 386, 396 (1989), compels the conclusion that Begin's use of force was unreasonable and violated the Fourth Amendment. Majority opinion at 11, 9. Ultimately, though, the majority determines that Begin is entitled to qualified immunity.

Qualified immunity does not protect Officer Begin for this first segment. There is no evidence that Begin deliberately violated the law, but his actions are an instance of plain incompetence. *See Humphrey*, 482 F.3d at 847 (qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law"). True, courts must give deference to the split-second, tough calls that police men and women have to make. But this is not a close case. Officer Begin had no reason to believe that the suspects announced in the BOLO would be armed or a flight risk. This is why *Smoak* and *Humphrey* are distinguishable. Those cases involved situations where the stopping officers were confronting suspects they initially thought might be armed. *Smoak*, 460 F.3d at 780; *Humphrey*, 482 F.3d at 848-849. And although Begin did not know what crime the BOLO targets were suspected of, we should not let a stopping officer's lack of knowledge of the crime give room for the officer to employ such an intrusive, threatening show of

deadly force. Rather, the burden should be on the officers to indicate during dispatch that there may be reason to exercise caution or additional force, as was the case in *Smoak* and *Humphrey*.

The majority seems to argue that an officer has to do something worse than what Begin did in order to lose the protection of qualified immunity. Majority opinion at 11. For instance, the defendants in *Pray v. City of Sandusky*, 49 F.3d 1154, 1159 (6th Cir. 1995), who were not protected by qualified immunity, behaved even worse than Begin. But that does not mean that this court should decide that Begin gets qualified immunity. Nor does *Smoak* purport to outline the lower threshold of constitutional violation required for the court to withdraw the shield of qualified immunity. For the majority's point to be supported, it would need cases arising out of conduct much more egregious than Begin's where the defendants nevertheless received qualified immunity.

It is understandable that plaintiffs' non-compliance with Begin's first two orders may have given him pause, especially since Begin was the lone officer at the scene. JA 525-26. But, as the district court observed, Officer Begin recognized the plaintiffs' disbelief and surprise when he ordered them to stop while their behavior was manifestly innocuous. *Id.*; *see also* District court opinion at 7, JA 35. There is no indication in the record that the nature of plaintiffs' protestations were defiant, aggressive, or showed the potential for physical confrontation.

Furthermore, it was not necessary to draw a weapon to demonstrate command of the situation. Begin had other means to avoid escalating the scene, means that did not require a show of force. The majority notes that Begin himself was not conducting the investigation, that Begin was merely under orders to stop and hold Dorsey and Clark until an officer who was familiar with the investigation of the car theft could arrive. Majority opinion at 9 n.6. True, Begin may not have had the authority to release the plaintiffs. And Begin himself may not have needed to elicit answers to confirm or dispel suspicion, as is the norm for a *Terry* stop, because he was simply holding plaintiffs in reliance on the BOLO. But some simple questions or a cursory inspection of plaintiffs' clipboards, voter registration materials, as well as their six other colleagues' corresponding effects, would have put a reasonable officer on notice that Begin's level of force was unnecessary. In other words, the majority rightly reasons that Begin didn't need to assess the situation as to whether there was enough reasonable suspicion for the *Terry* stop. But such an assessment would still be reasonable to discern the appropriate level of force to employ. Begin's choice was unreasonable and unconstitutional.

Therefore, I would affirm the district court's ruling that Begin is not shielded by qualified immunity as to Dorsey and Clark's excessive force claim.

III.  Unlawful arrest

To determine whether Begin's *Terry* stop escalated into an arrest, we "must determine whether the use of force was reasonably related to the situation at hand, or, in other words, whether the degree of intrusion was necessary in order to effectuate the *Terry* stop." *Feathers v. Aey*, 319 F.3d 843, 851 (6th Cir. 2003). As discussed above, Begin's use of force before Dawson's handcuffing was not necessary to effectuate the stop. That is why the stop ripened into an arrest.

The BOLO was issued without facts supporting reasonable suspicion, and neither did Begin observe anything that would give him probable cause to arrest Dorsey and Clark. Therefore, Begin's arrest was also unlawful, because it was executed without reasonable suspicion, let alone probable cause.

However, Begin cannot be held liable for unlawful arrest once Dawson arrived, because Dawson's handcuffing from that point onwards was the determinative restraint on the plaintiffs.

Again, I respectfully dissent from the majority's conclusion that Begin is entitled to qualified immunity for the same reasons I do not think qualified immunity should shield him from the excessive force claim.

I would affirm the district court's denial of qualified immunity for Officer Begin as to the unlawful arrest claim before Dawson handcuffed the plaintiffs.