NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0217n.06

No. 10-5398

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

*Feb 23, 2012*

LEONARD GREEN, Clerk

|  |  |  |
|---|---|---|
| CHARLES KOWOLONEK, | ) | |
| | ) | |
| Plaintiff–Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | EASTERN DISTRICT OF KENTUCKY |
| LES MOORE, CARL AGNER, | ) | |
| JASON REED, and STEVE BUTTS, | ) | |
| OFFICERS; CITY OF FLORENCE, | ) | |
| | ) | |
| Defendants–Appellees. | ) | |

Before: KENNEDY, GIBBONS, and KETHLEDGE, Circuit Judges.

**JULIA SMITH GIBBONS, Circuit Judge.** Plaintiff-appellant Charles Kowolonek appeals the denial of his partial motion for summary judgment and the grant of defendant-appellees' motion for summary judgment regarding his false detention/arrest and excessive force claims under 42 U.S.C. § 1983. The district court held that the four defendant police officers—Les Moore, Steve Butts, Carl Agner, and Jason Reed—did not violate Kowolonek's constitutional rights by handcuffing and briefly detaining him and that, in any case, they were entitled to qualified immunity. The district court also found that there was no evidence permitting an inference that any of the defendants had used a taser on Kowolonek.

For the following reasons, we affirm the decision of the district court.

-1-

**I.**

This case arises from an altercation between Charles Kowolonek and a number of police officers who responded to a 911 burglary call at his residence. On August 22, 2007, Officer Les Moore responded to a burglary in progress at 258 Merravay Drive in Florence, Kentucky. The dispatcher conveyed to Moore that the suspect was a Puerto Rican male in a gray t-shirt, possibly accompanied by someone else, who had entered the home and broken a window in the back of the house. The dispatch log also indicated that the suspect had short hair. The caller was mistaken: there was no burglary. The window had been broken, but only because Kowolonek, who lived with his mother at 258 Merravay, kicked a soccer ball through it. Kowolonek, whose father is black and whose mother is white, is not Puerto Rican.

Moore did not have the benefit of this information when he arrived at the Merravay residence to investigate. Upon arriving, Moore found Kowolonek seated on the front stoop of the house. Kowolonek was wearing a gray t-shirt, as described by the dispatcher, but Moore admitted that he did not think that Kowolonek was Puerto Rican. Moore said to Kowolonek that a burglary had been reported and asked him if he lived there and for his identification. Kowolonek said that he lived at 258 Merravay but had "no clue" where to find his identification. Moore also asked Kowolonek twice to put down a cigarette he was attempting to light. Kowolonek refused to do so, and Moore grabbed the cigarette from his mouth.

Kowolonek then stood up and "looked [Moore] dead in the eyes, trying to get across that he was a resident . . . of the home." He asked Moore what was happening and repeated that he was a resident. Moore responded, "I'm not going to arrest you." Kowolonek then turned his back on Moore to sit down again, and Moore handcuffed his left wrist. Kowolonek denied that he was trying to walk away from the officer when he turned around; he stated that he "[c]ould have been looking in the house to see if anybody was there to confirm that [he] lived there." However, he does admit to being "very upset" at the time.

After his left wrist was cuffed, Kowolonek reached for the screen door and grabbed it with his right hand. He claims he was attempting to stabilize himself. Miranda Wallace, Kowolonek's girlfriend, then came around the house and tried to get between Kowolonek and Moore. Wallace explained that Kowolonek lived there and that she would go inside to get Kowolonek's mother or his identification. At about the same time, Kowolonek let go of the door with his right hand, and Moore and Kowolonek found themselves in a mulched area near the stoop on the side of the house. Both men remained standing. Kowolonek knew that Moore was trying to handcuff him but would not allow Moore to do so because he was "embarrassed" about the police officer being in the yard. Instead, Kowolonek held his arms taut at his side.

Officers Jason Reed, Steve Butts, Carl Agner, and Jim Hill arrived shortly thereafter. Hill (not a party to this suit) was from the Sheriff's Department; the rest of the officers were from the Florence Police Department. According to the police log, Hill was the first after Moore to arrive on the scene, while the others arrived shortly after.

The officers surrounded Kowolonek and grabbed him, but Kowolonek stood his ground. Amidst the commotion, Kowolonek's mother began to yell from the upstairs window that Kowolonek lived there. Kowolonek heard one of the officers say that they were going to have to use their tasers, and Kowolonek told them that "a Taser would be the only way to get [me] . . . because my will was so high because of what—you know—I was at my house and my home . . . ." Kowolonek testified that one of the officers then used his taser on Kowolonek. Subsequently, the officers fully handcuffed Kowolonek and escorted him into a cruiser. After the officers spoke with a few neighbors and with Kowolonek's mother, they released him. Kowolonek was held in the cruiser for about five minutes.

Neither Kowolonek nor his mother saw who deployed a taser. Wallace stated that the last officer to arrive at the scene, who was wearing a brown uniform, used his taser on Kowolonek. She stated that all of the other officers were wearing black.

Kowolonek filed a complaint against officers Moore, Agner, Butts, and Reed under 42 U.S.C. § 1983, alleging that the officers had falsely detained/arrested him and used excessive force, in violation of the Fourth Amendment. He also made related claims under state law. After discovery, the parties moved for summary judgment. The district court held that the officers did not violate Kowolonek's constitutional rights under the Fourth Amendment and that, even if they had, they were entitled to qualified immunity. The district court also found that there was no evidence creating a genuine issue of material fact as to whether one of the defendants had used his taser on Kowolonek.

Accordingly, the district court denied Kowolonek's partial summary judgment motion, granted the

officers' summary judgment motion, and dismissed Kowolonek's state law claims without prejudice.

**II.**

We review a district court's grant of summary judgment on the grounds of qualified

immunity *de novo*. *Phillips v. Roane Cnty.*, 534 F.3d 531, 538 (6th Cir. 2008). Summary judgment

is only "appropriate where the pleadings, depositions, answers to interrogatories, and admissions on

file, together with the affidavits, if any, show that there is no genuine issue as to any material fact

and that the moving party is entitled to a judgment as a matter of law." *Id.* (citing Fed. R. Civ. P.

56(c)). "The moving party bears the burden of proving that there are no genuine issues of material

fact." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). "The ultimate inquiry is

'whether the evidence presents a sufficient disagreement to require submission to a jury or whether

it is so one-sided that one party must prevail as a matter of law.'" *Id.* (quoting *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)).

**III.  *Terry* Violation**

Kowolonek filed suit under 42 U.S.C. § 1983. To state a claim under § 1983, "a plaintiff

must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured

by the Constitution or laws of the United States (2) caused by a person acting under the color of state

law." *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006).

Qualified immunity is an affirmative defense to a § 1983 suit and shields "government

officials performing discretionary functions . . . from liability for civil damages insofar as their

conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "This 'objective legal reasonableness' standard analyzes claims of immunity on a fact-specific, case-by-case basis to determine whether a reasonable official in the defendant's position could have believed that his conduct was lawful, judged from the perspective of the reasonable official on the scene." *Cochran v. Gilliam*, 656 F.3d 300, 306 (6th Cir. 2011). Thus, to determine the merits of a qualified immunity defense, we "engage in a two-step analysis: (1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and if so, (2) whether that right was clearly established." *Ciminillo v. Streicher*, 434 F.3d 461, 466 (6th Cir. 2006). We may consider these two prongs in either order. *Cochran*, 656 F.3d at 306.

**A.**

We first consider whether the initial stop of Kowolonek was within the bounds of *Terry v. Ohio*, 392 U.S. 1 (1968). When evaluating an investigatory *Terry* stop, we determine (1) "whether there was a proper basis for the stop" and, if so (2) "whether the degree of intrusion . . . was reasonably related in scope to the situation at hand." *United States v. Smith*, 594 F.3d 530, 536 (6th Cir. 2010) (internal quotation marks omitted). A proper basis for a *Terry* stop exists where, under the totality of the circumstances, the officer has a "reasonable, articulable suspicion that [a] person *has been*, is, or is about to be engaged in criminal activity." *Id.* at 536–37 (internal quotation marks omitted). To determine whether the intrusion was reasonably related in scope to the situation at hand, we look to whether the stop was "'sufficiently limited in time'" and whether "'the investigative

means used [were] the least intrusive means reasonably available.'" *Id.* at 537 (quoting *United States v. Caruthers*, 458 F.3d 459, 468 (6th Cir. 2006)). We also consider whether the officers "'diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.'" *Id.* (quoting *United States v. Foster*, 376 F.3d 577, 585 (6th Cir. 2004)).

Here, the investigatory *Terry* stop began when Moore handcuffed one of Kowolonek's wrists, as it was at that point that a reasonable person would not have felt free to walk away. *See United States v. See*, 574 F.3d 309, 313 (6th Cir. 2009). Thus, the question is whether, prior to this point, Moore possessed reasonable, articulable suspicion that Kowolonek had engaged in criminal activity. *See Campbell v. Stamper*, 244 F. App'x 629, 631–32 (6th Cir. 2007). We find that he did.

Moore responded to a burglary-in-progress call in which the suspect was identified as a Puerto Rican male wearing a gray t-shirt with short hair who was possibly accompanied by an accomplice. Kowolonek generally fit this description, with the exception of his race. Unlike cases in which 911 calls fail to convey descriptive information or are made anonymously, thereby undermining support for reasonable suspicion, *see United States v. Johnson*, 620 F.3d 685, 693 (6th Cir. 2010); *Caruthers*, 458 F.3d at 465, here the caller was one of Kowolonek's neighbors who relayed fairly detailed information about both the nature of the crime and the suspect. The description was certainly imperfect, and under ideal circumstances, Moore would have called the dispatcher to confirm the description of the suspect. Yet Moore was responding to a burglary in progress and did not know if innocent individuals were in the home that was supposedly being

burglarized or if the alleged accomplice was still inside the house. Further, this court does not require an exact match between a description in a 911 call and the officer's observations to support a finding of reasonable suspicion. *See United States v. Long*, 464 F.3d 569, 574 (6th Cir. 2006) (finding that slightly inaccurate description of the color of a suspect's truck and the contents of its bed did not defeat a finding of reasonable suspicion); *United States v. Hurst*, 228 F.3d 751, 757 (6th Cir. 2000) (finding that "[t]he presence of three persons in the car, rather than two, is a discrepancy that might reasonably be explained in any number of ways and does not defeat the assessment" that the officer had reasonable suspicion).

In addition, Kowolonek's subsequent interaction with Moore also provided support for Moore's reasonable suspicion. Upon approaching Kowolonek, Moore explained that there was a report of a burglary at the residence and asked Kowolonek for identification. Kowolonek responded that there had been no burglary, and that he lived at the residence but did not know where his identification was. Moore was entitled to further investigate to corroborate this information, especially since he considered Kowolonek a suspect based on the 911 call. And given that Moore had explained that he was investigating a reported burglary at the residence, Kowolonek must have understood Moore's need to corroborate this information.

Instead, Kowolonek refused Moore's repeated requests for him to stop trying to light his cigarette. Moore then snatched the cigarette from Kowolonek's mouth, which made Kowolonek "very upset." Kowolonek then stood up and turned away from the officer and towards the house as he began to sit back down. Moore stated that "I'm not going to arrest you." Moore then cuffed one

of Kowolonek's wrists. Therefore, just before the stop, the totality of circumstances included the following: the 911 call that provided a description of a suspect generally resembling Kowolonek, the inability to immediately corroborate Kowolonek's identity, and Kowolonek's angry demeanor as well as his turning away from Moore towards the house. Further, at that point, Moore "still wasn't clear on what the situation was inside the house" or whether there were occupants inside. In light of these facts, Moore had reasonable suspicion to detain Kowolonek initially in order to at least determine his identity and temporarily prevent him from entering the house. *See Foster*, 376 F.3d at 586 (permitting *Terry* stop for purposes including identity confirmation).

**B.**

As the initial stop of Kowolonek was proper under *Terry*, the next question is whether the officers' subsequent actions—handcuffing Kowolonek completely and placing him into the cruiser for five minutes—were objectively reasonable. *Illinois v. Caballes*, 543 U.S. 405, 407 (2005) ("[A] seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution."). Once again, we consider whether the degree of intrusion was reasonably related in scope to the situation at hand by taking into account both the duration of the detention and the investigative means employed. *Smith*, 594 F.3d at 537. Of particular import is whether the officers "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Id*. (internal quotation marks omitted).

The mere duration of Kowolonek's detention was not objectively unreasonable. During this five-minute period, the officers spoke with neighbors and with Kowolonek's mother to confirm his identity, and then immediately released him. As the officers used the five minutes only to conduct their investigation and to confirm Kowolonek's identity, it cannot be said that the duration of the stop was unreasonable. *See United States v. Orsolini*, 300 F.3d 724, 730 (6th Cir. 2002) (upholding fifty minute detention under *Terry*); *United States v. Wellman*, 185 F.3d 651, 656 (6th Cir. 1999) (upholding fifteen or twenty minute detention under *Terry*).

We also consider whether the investigative means used—handcuffing Kowolonek and placing him into a cruiser—were the least intrusive reasonably available. In assessing reasonableness, we acknowledge "that police officers are often forced to make split second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Dorsey v. Barber*, 517 F.3d 389, 399 (6th Cir. 2008) (internal quotation marks omitted). We have cautioned that "it is inappropriate, in the quietude of our chambers, to second-guess standard police procedure and [] on-the-scene judgment." *Foster*, 376 F.3d at 587 (internal quotation marks omitted).

The use of handcuffs and detention in a cruiser do not automatically transform a *Terry* stop into an arrest. *Smoak v. Hall*, 460 F.3d 768, 781 (6th Cir. 2006). However, "these displays of force must be warranted by the circumstances." *Id.* Most commonly, we have found handcuffing and/or detaining a suspect in a police car permissible under *Terry* where there is a concern for officer safety because the suspect is thought to be armed. *See Houston v. Clark Cnty. Sheriff Deputy John Does*

*1-5*, 174 F.3d 809, 814 (6th Cir. 1999) (holding that forcing suspects from their cars at gunpoint, handcuffing them, and placing them into a cruiser did not exceed the bounds of *Terry* because the officers had a "reasonabl[e] fear that [the] suspects [were] armed and dangerous"); *see also Radvanksy v. City of Olmstead Falls*, 395 F.3d 291, 309 (6th Cir. 2005) (finding handcuffing reasonable where burglary suspect was reasonably deeded armed and dangerous). If a subject is unarmed, but nonetheless presents a risk to officer safety, handcuffing and detention in a cruiser may still be reasonable. *See Foster*, 376 F.3d at 586–87 (finding handcuffing and detention of subject reasonable where subject was thought to be under the influence of PCP and therefore potentially violent). Finally, a subject's attempt to flee or demonstrated flight risk may render handcuffing and detention in a cruiser objectively reasonable. *See Caruthers*, 458 F.3d at 468–69 (finding no *Terry* violation in part because suspect presented flight risk); *United States v. Jacob*, 377 F.3d 573, 578–80 (6th Cir. 2004) (same). However, where officer safety and suspect flight are of little concern, we have found handcuffing and detention unreasonable under *Terry*. *See Bennett v. City of Eastpointe*, 410 F.3d 810, 840 (6th Cir. 2005) (finding *Terry* violation where the handcuffed and detained suspects "made no movements consistent with flight," "answered the officers' questions," and "[t]here was no indication [they] were armed and dangerous").

Here, Kowolonek did not present an armed threat to officer safety, but he did actively resist being restrained and was visibly upset. Further, he turned his back on an officer and placed his hand on the door of a house that reportedly had just been burglarized and in which an accomplice was supposedly located, as well as possibly homeowners. During the "tense, uncertain, and rapidly

evolving" events that followed—events requiring exactly the type of "split second judgments" that we are loath to second guess—the officers chose first to focus on restraining an angry and resistant Kowolonek rather than listen to his mother, girlfriend, and neighbor, who tried to confirm Kowolonek's identity. *See Dorsey*, 517 F.3d at 399 (internal quotation marks omitted). On these facts, it is likely that the officers did not exceed the bounds of *Terry* by handcuffing and briefly detaining Kowolonek in a cruiser to dispel their reasonable suspicion that he was a burglar and a burglary had occurred.

However, we need not reach this question because even if there was a constitutional violation, we find that the officers are nonetheless entitled to qualified immunity because their actions did not violate clearly established rights. "For a right to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003) (quoting *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042 (6th Cir. 1992)). The exact action in question need not have previously been held unlawful, but the unlawfulness must be "apparent from direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs." *Id.* The critical question is whether it "'would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Slusher v. Carson*, 540 F.3d 449, 456 (6th Cir. 2008) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).

Kowolonek fails to cite to a single case that clearly establishes the contours of his rights such that a reasonable officer would know that this conduct was unlawful. Kowolonek's reliance upon

*Smoak*, 460 F.3d at 782, is misplaced because in that case the officers continued to detain the suspects for nine minutes *after* they no longer had reasonable suspicion, whereas here the officers detained Kowolonek for five minutes in order to dispel their reasonable suspicion. Further, while Kowolonek did not present an armed threat or high-speed flight risk that readily would have justified his detention, *see Houston*, 174 F.3d at 814; *Jacob*, 377 F.3d at 578–80, he did turn his back on Moore, place his hand on the door, and resist officers' attempts to handcuff him. These actions are far more aggressive than those of the suspects in *Bennett*, 410 F.3d at 840, whose detention exceeded the bounds of *Terry*. As a result, the officers' conduct here is easily "near enough to the 'hazy' border separating illegal from legal conduct for qualified immunity to attach." *See Bing v. City of Whitehall*, 456 F.3d 555, 571 (6th Cir. 2006).

Further, although the officers regrettably made a mistake—there was in fact no burglary, and Kowolonek was innocent—this mistake does not automatically disqualify them from entitlement to qualified immunity. *See Dorsey*, 517 F.3d at 394. "The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct," and to protect "all but the plainly incompetent or those who knowingly violate the law." *Id.* (internal quotation marks and citations omitted). The precise question is whether the officers "had a sufficient factual basis for thinking that they were acting consistently with *Terry*" when they handcuffed and briefly detained Kowolonek. *Smoak*, 460 F.3d at 782. Here, Moore reasonably believed that he was confronting a burglary suspect and that he had to prevent that suspect from entering into the house that he thought—based on the dispatch—was occupied by innocent

homeowners and/or an accomplice. This was certainly a sufficient factual basis for him to believe that he was complying with the law in detaining Kowolonek.

Furthermore, when Officers Butts, Agner and Reed arrived, they knew that a burglary had been reported and they observed Moore in a physical struggle with Kowolonek. They did not know whether Kowolonek posed a risk to their safety or was armed; they only witnessed Kowolonek engaged in a physical struggle with Moore and began to assist. Given this information, these officers also "had a sufficient factual basis for thinking that they were acting consistently with *Terry*." *See id.*

Therefore, we find that even if the officers violated Kowolonek's constitutional rights, those rights were not clearly established, and thus the officers are entitled to qualified immunity.

## IV. Excessive Force

Kowolonek also contends that the means that the officers employed—restraining him in handcuffs and using a taser against him—amounted to excessive force. The discussion above regarding Kowolonek's claim that his handcuffing was unreasonably intrusive under *Terry* applies fully to his claim that those actions amounted to excessive force because the standards governing these claims are "essentially the same." *See Dorsey*, 517 F.3d at 401; *see also Smoak*, 460 F.3d at 783 ("Insofar as [plaintiff's] claim of excessive force relates to the intrusiveness of the seizure once the stop was made, the discussion above [evaluating the reasonableness of the seizure] is fully applicable."). Thus, as to the excessive force claim based on handcuffing and detention in the

cruiser, we reach the same conclusion outlined above: all of the officers are entitled to qualified immunity.

However, Kowolonek also claims that one of the officers employed excessive force by using a taser. The district court found that there was no genuine issue of material fact as to whether any of the defendants (Moore, Butts, Agner, or Reed) used a taser against Kowolonek and thus granted summary judgment to the officers. At this stage, the issue is not whether an officer used his taser on Kowolonek, since we construe the facts in his favor. Rather, the issue is the identity of the officer who used his taser on Kowolonek.

Kowolonek's only evidence that one of the defendants used a taser against him is that Wallace, Kowolonek's girlfriend, stated that "the last guy to arrive on the scene was the one who tased him." According to the police log, this was a Florence police officer. However, Wallace's testimony is highly inconsistent on this point. She concedes that the individual she saw use a taser against Kowolonek was wearing a brown uniform and that all of the other officers were wearing black uniforms. Moore, Butts, Agner and Reed—all Florence police officers—were issued and were wearing black uniforms on the date in question. The only conclusion to be drawn from these facts is that Officer Hill, a Boone County police officer and not a party to the suit, was wearing the brown uniform. Moreover, Wallace said that there were only two officers on the scene when the "last guy pulled up." However, there were five officers in total, not three. As Wallace apparently did not see all of the officers arrive—which is understandable, as she was inside the house during part of the altercation—her testimony as to the actions of the "last" officer to arrive cannot be credited, even

at summary judgment. Further undermining her testimony, Wallace recalled that the taser employed was black and red, while all four defendants averred that their tasers are yellow in color.

Given the patent weaknesses and contradictions in Wallace's testimony—the only testimony upon which Kowolonek relies to support his claim that one of the defendants used a taser against him—it was not error for the district court to find no genuine issue of material fact and grant summary judgment for the defendants. *See Griffin v. Hardrick*, 604 F.3d 949, 954 (6th Cir. 2010) ("'When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.'" (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007))). Therefore, we need not reach the question of whether the force employed by using a taser against Kowolonek was indeed excessive.

Kowolonek's final argument, that the officers violated a duty by failing to stop the taser from being used, also rings hollow. "[A] police officer who fails to act to prevent the use of excessive force may be held liable when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997). Even if Kowolonek can show that the officers had reason to know that a taser would be used against him, Kowolonek cannot show that they had the opportunity and means to stop it from happening. In Kowolonek's estimation, the entire incident, starting with the initial altercation with Moore and ending with Kowolonek's handcuffing, lasted only "minutes." The use of a taser could only have lasted for a

fraction of this time. And we have recognized a duty of protection only where the "underlying episode of excessive force . . . spanned a sufficient period of time for a nearby defendant to both perceive what was happening and intercede to stop it." *Ontha v. Rutherford Cnty.*, 222 F. App'x 498, 506 (2007). *Compare id.* at 501, 506–07 (finding no failure to intervene where instance of excessive force lasted six or seven seconds) *with Durham v. Nu'man*, 97 F.3d 862, 868 (6th Cir. 1996) (reversing award of summary judgment for the defendant where a beating "lasted approximately ten minutes" and the defendant nurse "watched the beating unfold on her monitor from the nurse's station, and then from the doorway of . . . the room where the beating took place"). Given the rapid sequence of events here, the officers did not have the opportunity to intervene to prevent the harm from occurring.

## V. State Law Claims

As the district court did not err in granting summary judgment to the officers on Kowolonek's federal claims, it also did not err in declining jurisdiction over Kowolonek's related state-law claims pursuant to 28 U.S.C. § 1367(c).

## VI.

For the foregoing reasons, we affirm the decision of the district court.