*398 SUHRHEINRICH, Circuit Judge,
dissenting.
Because I believe the majority analyzes the deputies’ conduct through the lens of hindsight in denying them qualified immunity, I dissent. See Graham v. Connor, 490 U.S. 386, 396-97, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (holding that whether an officer’s use of force was “objectively reasonable” must be “judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.”). Granted, Deputy Lopez’s use of the Taser was a close call. But that is the point of qualified immunity: to give credit to officers’ judgment in ambiguous situations. See id. at 397, 109 S.Ct. 1865 (stating that courts must make “allowance for the fact that officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving”).
I. Deputy Lopez’s Use of the Taser
First, I believe that Deputy Lopez’s use of the Taser was an objectively reasonable use of force and not a constitutional violation.
A brief review of the facts “taken in the light most favorable to the plaintiff but viewed from the perspective of a reasonable officer on the scene” explains why the deputies’ actions were objectively reasonable. Grawey v. Drury, 567 F.3d 302, 309 (6th Cir.2009). The EMTs and Deputy Lopez arrived at the scene in response to a call reporting the death of Kent’s father. They proceeded to the upstairs bedroom where Kent’s father was lying in bed. Firefighter-EMT Oryszczak advised Kent that he had a duty to attach an AED to Kent’s father, apparently to determine whether Kent’s father was in fact dead, and to “do everything he could for him” if he was not. Kent flew into a tirade, shouting at Oryszczak that “he was not going to assault my dead father.” Oryszczak told Deputy Lopez “he had an obligation to render aid to the deceased and could not because he was in fear of Michael Kent intervening.” Deputy Maher arrived, and Kent repeated his threat to the EMT personnel and deputies that “they were not going to assault my dead father or I was going to call the police and have them thrown in jail.” Deputy Lopez explained the EMT’s duty to act to Kent, and Deputy Maher commanded Kent to calm down. Kent retorted: “I did not have to calm down, that it was my home, and that they were not going to assault my dead father in my home against his wishes.” At that point, Deputy Lopez pulled out his Taser and warned he would use it if Kent would not calm down and leave the room. Appellee Br. 9.[1] Kent did not leave the room. *399 Standing in front of the wall, Kent instead raised his hands above his head and taunted, “Go ahead and tase me then.” Id. Deputy Lopez then deployed his Taser for a five-second cycle. Id. at 10. Kent fell to the floor, and Deputy Maher handcuffed him. Id. EMTs “ran a strip” on Kent’s father that indicated not to attempt resuscitation. EMTs later removed the Taser probes and dressed Kent’s wounds, which did not require further medical attention.
The undisputed facts establish that Deputy Lopez applied minimal force to secure Kent’s submission so that Oryszczak and the other EMTs could perform their duties without fear in an emergency situation. Yet the majority dismisses this emergency as insufficiently serious compared to the situation in Strieker v. Township of Cambridge, 710 F.3d 350, 364-65 (6th Cir.2013). Maj. Op. at 394-95. In Strieker, the court found that pointing a taser gun, using a pressure hold, and handcuffing did not violate the Fourth Amendment where the plaintiff had repeatedly repelled officers’ attempts to respond to a 911 call reporting her son’s potential drug overdose. Id. at 355-56. A principal justification for the officer’s use of force in Strieker was the plaintiff’s “earlier attempts to prevent medical personnel’s access to [the son who overdosed].” Id. at 365. Like the officers in Strieker, Deputies Lopez and Maher faced an individual blocking their attempts to examine and assist a person in potential medical distress. The majority trivializes the perceived emergency here because the officers “knew they were responding to a natural death investigation.” Maj. Op. at 394. But this assessment disregards the EMTs’ duty to test for signs of life and, if Kent’s father was still alive, provide medical assistance. It also fails to perceive the officers’ understandable sense of urgency to enable the EMTs to act quickly since an AED must be administered within minutes of a cardiac arrest to restore life, see Maj. Op. at 387-88 n. 1, leaving little time for verbal persuasion or other more tentative measures.[2]
The majority also mischaracterizes Kent’s behavior as submission or, at most, passive resistance. The opinion contrasts Kent’s behavior with the intoxicated and threatening plaintiff who fled police in Caie v. West Bloomfield Township, 485 Fed.Appx. 92, 96-97 (6th Cir.2012), where the court upheld use of a Taser, and likens it to the single act of disobedience and verbal defiance in Goodwin v. City of Painesville, 781 F.3d 314, 323-24 (6th Cir.2015), where the court held use of a Taser unreasonable. See Maj. Op. at 392-96. Neither Caie nor Goodwin, however, establishes that Kent’s aggressive and arguably threatening behavior posed mere passive resistance. Although Kent was not intoxicated, did not threaten the officers or EMTs with physical harm, and did not run from the police like the plaintiff in Caie, his behavior was equally volatile. He obstructed emergency medical treatment, *400 disobeyed the officers’ orders when they attempted to allow the EMTs to perform their duties, placed the EMTs in fear of violence, and goaded the police officers into using physical force. Kent’s repeated protest that “they [the EMTs] were not going to assault my father” implied (and a reasonable officer could certainly infer that) he would physically stop the EMTs from attaching the AJED, as indicated by Oryszczak’s statement to Deputy Lopez that he “was in fear of Michael Kent intervening.” Reacting to the perceived medical emergency and the threat of physical interference with medical personnel, Deputy Lopez reasonably used a single five-second Taser cycle to deescalate Kent’s aggression and restore order, similar to the officer in Caie “neutralizing what a reasonable officer could perceive as a dangerous situation.” Caie, 485 Fed.Appx. at 97.
Caie actually supports Deputy Lopez’s use of a Taser in this situation. The plaintiff in Caie was tased only after he was “taken to the ground” and refused to move his hands for handcuffing. Id. at 94. Even though the Caie plaintiff was “arguably subdued” and the risk of harm or flight had been minimized, the court upheld the tasing because the plaintiff “continued to be uncooperative.”[3] Id. at 97. Kent similarly charged his apparently nonthreatening posture with a defiant dare to “go ahead and tase me then.” Deputy Lopez could reasonably have perceived this behavior as a continued threat and not submission. In response, Deputy Lopez used the minimum amount of force necessary to stabilize the situation.
Nor is Kent’s behavior akin to the plaintiffs single act of disobedience in Goodwin. Kent admittedly disobeyed at least two direct police commands, refused to cooperate with Deputy Lopez’s attempts to explain EMTs’ duties to act, repeatedly shouted at EMT personnel and the police, and dared the officers to use physical force. The Goodwin plaintiff disobeyed and verbally defied only one police command to step outside his apartment. Goodwin, 781 F.3d at 319, 326. Moreover, Deputy Lopez acted under emergency conditions not present in Goodwin, which involved an arrest for disorderly conduct. Deputy Lopez had to act quickly to restrain Kent from delaying potentially urgent medical aid; in contrast, the Goodwin officers had little reason to tase the plaintiff before attempting less forceful measures to carry out the arrest.
An Eleventh Circuit case presents a closer factual scenario to this case than either Caie or Goodwin and confirms that Deputy Lopez’s decision to tase Kent did not violate the Constitution. In Draper v. Reynolds, 369 F.3d 1270, 1272-73, 1278 (11th Cir.2004),[4] the court held the use of a *401 Taser gun at a traffic stop reasonable in response to the plaintiff loudly insisting he had done nothing wrong, accusing the officer of harassing him, repeatedly refusing to produce documents the officer requested, and stating, “I’m not going to kiss your damn ass because you’re a police officer.” The plaintiff never directly threatened to use physical force, and the officer never informed the plaintiff he was under arrest. Id. at 1272-73. Yet the court found the officer’s use of a Taser gun reasonable even without a verbal arrest command in response to the plaintiffs “hostile, belligerent, and uncooperative” attitude; noncompliance with multiple police commands; complaints of police harassment; and repeated yelling at the officer. Id. at 1278. Here too, Kent was hostile and uncooperative, accused both the EMTs and officers of “assaulting]” his father, ignored repeated commands to calm down and exit the room, and yelled at everyone around him. As Draper indicates, just because Kent was not told he was under arrest, never expressly threatened to use violence, and never physically resisted the officers does not mean he could disobey and verbally antagonize the officers with impunity.
Notably, the majority does not suggest what Deputy Lopez should have done instead of tasing Kent. A key reason judges should give deference to officers’ judgment in difficult scenarios like this one is the inability of courts to recommend an alternative course of action for police officers. See Eldridge v. City of Warren, 533 Fed.Appx. 529, 538 (6th Cir.2013), (Norris, J., dissenting) (observing that “the majority’s opinion offers little guidance to officers confronting a similar situation, in the future”). It is undisputed that Oryszczak told Deputy Lopez he was fearful Kent would assault him if he tried to administer the AED. From Deputy Lopez’s perspective, then, a failure to act could have resulted in a delayed medical response and a loss of life to Kent’s father. Attempting a verbal arrest command and physical removal of Kent could have led to a physical altercation that likely would have harmed Kent, the EMTs, or the deputies more than a five-second Taser cycle and would have further delayed any resuscitation attempt had Kent’s father been alive. See Draper, 369 F.3d at 1278 (“a verbal arrest command accompanied by attempted physical handcuffing, in these particular- factual circumstances, may well have, or would likely have, escalated a tense and difficult situation into a serious physical struggle in which either Draper or Reynolds would be seriously hurt”); see also Hagans v. Franklin Cnty. Sheriff’s Office, 695 F.3d 505, 510 (6th Cir.2012) (noting that Tasers present “a significantly lower risk of injury than physical force”). Confronted with this unpromising set of options, Deputy Lopez’s decision to tase Kent can hardly be branded “objectively unreasonable.”
In truth, the only person in the room that day who acted objectively unreasonable was Kent. Although understandably distraught over the very recent death of his father, Kent’s disrespect and outright aggression towards EMT personnel and police created needless upheaval over what turned out to be mere confirmation that Kent’s father was dead. We expect our police officers to exercise restraint and use good judgment, but that does .not divest *402 ordinary citizens — especially highly educated ones like Kent — of their own responsibility to use self-control and comply with reasonable police commands. Kent’s irate overreaction created a stressful, difficult situation that forced Deputy Lopez to make a split-second, perhaps imperfect, but nevertheless reasonable judgment to subdue Kent by tasing. Kent should not be allowed to recover now because he believes Deputy Lopez’s judgment was mistaken.
Because I find Deputy Lopez’s use of the Taser to subdue Kent did not violate the Constitution under the version of facts most favorable to Kent, I would reverse the district court’s denial of qualified immunity to Deputies Lopez and Maher. Under the same analysis, I would reverse the district court’s denial of governmental immunity to the deputies on Kent’s state law assault and battery claims.
II. Deputy Maher’s Failure to Intervene
Even if Deputy Lopez’s use of the Taser violated Kent’s right to be free from excessive force, Deputy Maher did not violate that right because the tasing lasted only five seconds, leaving Deputy Maher no realistic opportunity to intervene.
Police officers may be liable for failing to protect a person from excessive force if the officer knew or should have known that excessive force would or might be used, and the officer had both the opportunity and means to prevent the harm from occurring. Turner v. Scott, 119 F.3d 425, 429 (6th Cir.1997). No duty to intervene exists, however, where one officer’s act of excessive force occurs so rapidly that a second officer on the scene lacks “ ‘a realistic opportunity to intervene and prevent harm.’ ” Wells v. City of Dearborn, 538 Fed.Appx. 631, 640 (6th Cir.2013) (quoting Ontha v. Rutherford Cnty., Tenn., 222 Fed.Appx. 498, 507 (6th Cir.2007)).
The majority claims that Deputy Maher had the opportunity to prevent the tasing here because she was in the bedroom with Deputy Lopez and Kent, she saw Deputy Lopez point the Taser at Kent, and she was standing close enough to Kent to handcuff him after he was tased. Maj. Op. at 398-400. But our case law makes clear that where an instance of excessive force lasts only a matter of seconds, officers have no opportunity to intercede and therefore cannot be held liable for failing to prevent the violation. See, e.g., Amerson v. Waterford Twp., 562 Fed.Appx. 484, 490 (6th Cir.2014) (finding an officer had no opportunity to prevent two strikes to the plaintiffs head because the span of time for intervention “could not have been more than a few seconds”); Wells, 538 Fed.Appx. at 640 (finding no opportunity to prevent a knee strike and tasing where the acts were “rapid” and did not constitute an “extended string of abuses”); Burgess v. Fischer, 735 F.3d 462, 476 (6th Cir.2013) (finding no opportunity to prevent a “takedown” that lasted no more than ten seconds); Kowolonek v. Moore, 463 Fed.Appx. 531, 539 (6th Cir.2012) (finding that officers had no opportunity to stop a tasing that “could only have lasted for a fraction” of the entire altercation with police, which itself lasted only minutes); Ontha, 222 Fed.Appx. at 506-07 (finding officer who was a passenger in a patrol car that ran over a fleeing suspect lacked opportunity to “implement preventative measures within a short time span of six to seven seconds”).
Kowolonek v. Moore is particularly on point. In Kowolonek, the plaintiff alleged that one of the five officers attempting to detain him threatened to use a Taser and then did so after the plaintiff stated “a Taser would be the only way to get [me].” 463 Fed.Appx. at 533. The court rejected *403 the plaintiffs “failure to intervene” claim against the officers who witnessed the tas-ing, ruling that “[e]ven if Kowolonek can show that the officers had reason to know a taser would be used against him” due to the tasing officer’s warning, the officers lacked the opportunity to stop the tasing because the entire altercation lasted only minutes, and the use of the taser “could only have lasted for a fraction of this time.” Id. at 539. This Court reached the same result in another tasing case, Wells v. City of Dearborn, 538 Fed.Appx. at 640, because the tasing there occurred only once and at a “fleeting point[] in time.” The court reasoned that “in the absence of ongoing, repeated tasing, there was no way for [the officers] to intervene and prevent harm.” Id. As in Kowolonek and Wells, Deputy Lopez discharged his Taser only once, and the Taser application lasted only five seconds. Appellee Br. 10. And like the tasing officer’s warning in Kowolo-nek, Deputy Lopez’s warning that he would use the Taser did not change the brief duration of the force itself and, therefore, did not create an opportunity for Deputy Maher to intervene.
For these reasons, the majority’s reliance on Goodwin is misplaced. There, we found that the plaintiff stated a constitutional violation where the officers confronted “a prolonged application of force” — a twenty-one-second initial tasing followed by an additional five-second tasing — because the officers could have interrupted the abuse or at least prevented its repetition. Goodwin, 781 F.3d at 319, 329. As stated, Deputy Maher could not have acted in five seconds. Thus, Deputy Maher is entitled to qualified immunity in any event.
For the foregoing reasons, I respectfully dissent.

. The majority assumes that Deputy Lopez commanded Kent only to calm down, and not to leave the room, because neither Kent nor any other witness recalls in their written statements that Deputy Lopez ordered Kent to leave the room. Maj. Op. at 388 n. 2. Kent, however, admits in his brief that "Deputy Lopez then pulled out his taser and told Dr. Kent to calm down and to leave the room or he would use the taser.” Appellee Br. 9 (emphasis added). Because Kent admits in his brief that Deputy Lopez gave this command, this fact is part of "plaintiff’s facts” and thus may be considered for the purpose of reviewing a denial of qualified immunity. Quigley v. Tuong Vinh Thai, 707 F.3d 675, 680 (6th Cir.2013) ("a defendant denied qualified immunity may appeal only if the issue on appeal is whether the plaintiff’s facts, taken at their best, show that the defendant violated clearly established law”); see also Moore v. Lafayette Life Ins. Co., 458 F.3d 416, 435 (6th Cir.2006) (considering a fact admitted in a party’s brief for purposes of reviewing a grant of summary judgment); Andersons, Inc. v. Horton Farms, Inc., 166 F.3d 308, 316 (6th Cir.1998) (same). Furthermore, in the district court, Kent neither denied that Deputy Lopez ordered him to leave the room nor presented facts' inconsistent with Deputy Lopez giving this command, making this fact effectively undisputed.

. The majority also distinguishes Strieker by noting it “did not involve a tasing.” Maj. Op. at 394. But the fact that Deputy Lopez used a Taser instead of a pressure hold speaks only to the different kind of resistance each officer encountered in the moment; the plaintiff in Strieker was crouching down in a closet, and the officer used a pressure hold to force her to stand, Stricker, 710 F.3d at 356, whereas Kent was standing, yelling, and refusing to leave the room so EMTs could perform their job. Kent’s more volatile resistance justifies a more substantial application of force. See Smoak v. Hall, 460 F.3d 768, 783 (6th Cir.2006) (noting that the objective reasonableness standard includes “ ‘a built-in measure of deference to the officer’s on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case’ ” (emphasis added) (quoting Burchett v. Kiefer, 310 F.3d 937, 944 (6th Cir.2002))).

. Lower courts in our circuit have similarly upheld file tasing of handcuffed individuals when they continue to exhibit verbal defiance and noncompliance with police orders. See Alexander v. City of Shelby Twp., No. 07-cv-14741, 2009 WL 3241974, at *2 (E.D.Mich. Oct. 8, 2009) (finding the tasing of a handcuffed plaintiff not excessive force where plaintiff disobeyed multiple orders to enter the patrol car and had displayed a belligerent and threatening attitude since his arrest); De-vos v. Rebant, No. 05-71863, 2006 WL 334297, at *6-7 (E.D.Mich. Feb. 13, 2006) (finding the tasing of a handcuffed plaintiff not excessive force because'the plaintiff, who had been “hostile and uncooperative” from the start of the police encounter, • "still was resisting the officers’ commands to enter the police car and was arguing with them”).

. This out of-circuit case is relevant in analyzing whether Deputy Lopez’s conduct violated the Constitution in the first instance — not in determining whether his conduct violated a "clearly established” constitutional right. As this opinion does not reach the "clearly established” prong of the qualified immunity analysis, it does not rely on Draper to show that *401 Deputy Lopez reasonably relied on out-of-circuit law in tasing Kent. Rather, this opinion looks to Draper as guidance for what constitutes an objectively reasonable police response to behavior closely analogous to Kent’s. The majority’s expressed concern that reference to this Eleventh Circuit case would effectively require law enforcement to learn "the ‘clearly established’ holdings of other circuits” is, therefore, unfounded. Maj. Op. at 397.