IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs May 17, 2017, at Knoxville

## STATE OF TENNESSEE v. BRANDON DEWAYNE THEUS

**Appeal from the Circuit Court for Madison County**
**No. 16-14     Roy B. Morgan, Jr., Judge**

_____

### No. W2016-01626-CCA-R3-CD

_____

A Madison County jury convicted the Defendant, Brandon Dewayne Theus, of unlawful possession of a firearm after previously having been convicted of a felony involving the attempted use of force, violence, or a deadly weapon. The trial court sentenced the Defendant to nine years in the Tennessee Department of Correction as a Range II, multiple offender. On appeal, the Defendant challenges the trial court's denial of his motion to suppress evidence discovered as a result a vehicle stop, the sufficiency of the evidence, and his sentence. Upon reviewing the record and the applicable law, we affirm the judgment of the trial court. However, we remand the case to the trial court for correction of the judgment to reflect that the Defendant was convicted pursuant to Tennessee Code Annotated section 39-17-1307(b)(1)(A) rather than section 39-17-1307(c).

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed;
Remanded**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ROBERT W. WEDEMEYER, J., joined.

George Morton Googe, District Public Defender, and Jeremy B. Epperson, Assistant District Public Defender, for the appellant, Brandon Dewayne Theus.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Jerry Woodall, District Attorney General; and Jody S. Pickens, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

**FACTUAL AND PROCEDURAL HISTORY**

The Defendant's conviction resulted from a traffic stop during which officers observed a .40 caliber firearm inside a truck that the Defendant had been driving. The evidence presented at trial established that on May 19, 2015, between 11:30 p.m. and midnight, Investigator Robert Groves with the patrol division of the Jackson Police Department received a be-on-the-lookout alert (BOLO) from the dispatcher regarding a vehicle which was suspected to have been involved in a robbery and which was traveling down East Chester Street into the city from the Beech Bluff area. The vehicle was described as a white Chevrolet Silverado pickup truck that was occupied by an African-American man and a Caucasian man.

Investigator Groves turned onto East Chester Street and saw a white Chevrolet Silverado pickup truck, which appeared to be occupied by an African-American male, in the parking lot of an Exxon. Investigator Groves reported over the police radio that he observed a vehicle matching the description of the vehicle reported in the BOLO alert and that he planned to attempt to stop the vehicle. Investigator Groves allowed the truck to drive out of the parking lot and then stopped the truck in the area of Griffin Street and East Chester Street.

Officer Kyle Hamilton and another officer joined Investigator Groves at the stop. Investigator Groves approached the driver's side of the truck, while Officer Hamilton and the other officer approached the passenger's side. The driver of the truck was identified as the Defendant. Investigator Groves informed the Defendant that he had been alerted to an incident outside of the city that involved a truck matching the description of the truck that the Defendant was driving. As Investigator Groves was speaking to the Defendant, Officer Hamilton signaled to Investigator Groves that he saw a weapon in the truck. Investigator Groves asked the Defendant to step out of the truck in order to distance the Defendant from the weapon.

Investigator Groves testified that the Defendant initially refused to comply with his instruction to exit the truck. The Defendant stated that he was not going to exit the truck, asked why he needed to exit the truck, and stated that his grandfather lived down the street. The Defendant eventually exited the truck after Investigator Groves opened the door.

Investigator Groves stated that the officers did not mention to the Defendant that they saw a weapon inside of the truck. When one of the officers told the Defendant that the officer was going to pat the Defendant down for weapons, the Defendant stated that the truck belonged to his grandfather and that his grandfather had a gun inside the truck. Investigator Groves informed the Defendant that the officers had to determine whether

the Defendant was allowed to possess a gun and whether the gun was stolen. The Defendant told Investigator Groves that the gun was not stolen and asked to call his grandfather.

Investigator Groves ran the Defendant's information through the National Crime Information Center (NCIC) and learned that the Defendant had two prior felony convictions. He subsequently arrested the Defendant and placed him in the backseat of the patrol car. While the Defendant was in the backseat of the patrol car and the officers were outside, the Defendant retrieved his cellular phone and made multiple calls. Investigator Groves testified that during one conversation, a man asked whether the Defendant's fingerprints would be on the gun, and the Defendant replied that they should not be on the gun. The video of the stop from the dash camera and the backseat camera of Investigator Groves's patrol car were played for the jury. The man whom the Defendant called was later identified as the Defendant's grandfather, and the Defendant told his grandfather that a friend placed the gun in the truck. During a call to a woman who was later identified as the Defendant's girlfriend, the Defendant informed her that he had been arrested due to "the gun."

The officers recovered a Hi-Point handgun with a magazine loaded with ten .40 caliber rounds from the truck. Investigator Groves stated that the gun was lying on the floorboard with the grip of the gun facing the driver.

On cross-examination, Investigator Groves testified that the Defendant was not involved in the robbery in the Beech Bluff area. The owner of the truck was Mr. Leroy Theus, who lived on Griffin Street, the area in which Investigator Groves stopped the truck. At one point during the stop, Investigator Groves told the Defendant, "You're good," but he did not know why he made the statement.

Investigator Groves testified that the gun was located on the back floorboard with a portion of the gun "barely" underneath the seat. He acknowledged that he believed that the gun was physically placed within arm's reach of the driver.

On redirect examination, Investigator Groves testified that he had to make a "U-turn" in order to initiate the stop. He said that as a result, the Defendant had ample time to discard the gun or place it anywhere inside the truck.

Mr. Leroy Theus, the Defendant's grandfather, testified that he lived on Griffin Street and owned a white Chevrolet Silverado pickup truck. Mr. Theus denied that the gun found in the truck belonged to him and said he did not know who owned the gun.

Officer Amiee Oxley, the director of the property and evidence unit of the Jackson Police Department, was unable to find any identifiable fingerprints on the gun. She explained that according to the Bureau of Alcohol, Tobacco, Firearms, and Explosives, the likelihood of locating fingerprints on a firearm is approximately ten percent because firearms generally have few smooth surfaces. Officer Oxley stated that based on her experience, the likelihood is approximately five percent. Officer Oxley did not attempt to obtain fingerprints from the rounds in the magazine.

Officers traced the gun seized from the truck to Ms. Briyana Gray. Ms. Gray purchased the gun through a website in 2014; the gun was transferred to Range USA in Jackson; and Range USA transferred the gun to Ms. Gray in November 2014. Ms. Gray testified that she kept the gun for six or eight months and then sold it to her cousin, Rondrez Billings, because her mother did not want it in her house. Ms. Gray did not know what happened to the gun after she sold it.

On cross-examination, Ms. Gray testified that she received a subpoena to testify a few months before trial. She said she did not have any issues coming to court to testify. She did not know the Defendant and had not seen him or spoken to him previously.

The State introduced a recording of telephone calls made by the Defendant from the jail two days prior to trial. During one of the calls, the Defendant instructed his girlfriend to tell Mr. Billings and Ms. Gray not to attend the trial and told his girlfriend to inform Mr. Billings that the Defendant knew where he lived and was "serious as a heart attack."

Investigator Ashley Robertson with the Jackson Police Department testified that after officers initially interviewed Ms. Gray, they attempted to locate Mr. Billings but were unsuccessful. A subpoena was issued for Mr. Billings on March 16, 2016, to testify during the May 2016 trial but was returned on March 18 as undeliverable because the apartment listed on the subpoena was vacant.

The State introduced a certified judgment showing that on February 12, 2001, the Defendant pled guilty to facilitation of first degree murder and received a fifteen-year sentence.

The Defendant testified that he was with Mr. Billings prior to the stop. He said they had just left work for the day and stopped by his grandfather's house to borrow his truck so that they could go to the convenience store to purchase cigarettes. The Defendant stated that as they were driving into the parking lot, he saw six cars from the sheriff's office driving down East Chester Street. He saw two patrol cars driving up and

down the street as he entered the convenience store. He said that when he returned to the truck, Mr. Billings was gone.

The Defendant testified that he was driving to his grandfather's house to return the truck when he was stopped by the police. The Defendant stated that after the officer approached the truck, the officer told him that he "was good," which meant that he was allowed to leave. The officer then instructed him to step outside of the truck. The Defendant told the officer that he did not do anything wrong, that he could produce a valid driver's license and the truck's registration, and that the truck belonged to his grandfather, who could give the officers permission to search the truck.

The Defendant maintained that the video recording of the stop was not accurate because it did not depict the second officer assuming control of the situation and the second officer's statements could not be heard in the recording. According to the Defendant, the second officer instructed him to exit the truck and that when the Defendant asked why, the second officer replied, "It's a gun right there." The Defendant testified that he did not know that a gun was inside the truck and did not learn about the gun until the officers informed him of it. The Defendant stated that the gun was on the floorboard behind the passenger's seat and tucked a bit underneath the seat. He explained that he believed that the gun had to belong to his grandfather because the gun was in his grandfather's truck. The Defendant stated that after he received discovery from the State, he saw Mr. Billings's name on the witness list and Ms. Gray's statement to the police that she sold the gun to Mr. Billings. The Defendant explained that after reviewing this information, he believed that Mr. Billings placed the gun inside the truck and then fled.

The Defendant also maintained that the recording of his cellular phone conversations while in the backseat of the patrol car was inaccurate. He stated that when his girlfriend asked him why he was going to jail, he did not say "the gun" but said "a gun."

On cross-examination, the Defendant testified that although he told his grandfather that a friend placed the gun inside the truck, he later said that he did not know who placed the gun inside the truck. The Defendant explained that the friend to whom he was referring was Mr. Billings.

While acknowledging that he told his girlfriend to contact Mr. Billings and tell him to not attend the trial, the Defendant denied that he attempted to prevent witnesses from attending the trial and testifying. The Defendant also denied threatening Mr. Billings. The Defendant stated that although he believed that Mr. Billings would testify that the gun belonged to Mr. Billings, the Defendant told Mr. Billings to not attend trial

because he believed that Investigator Robertson "probably had got to" Mr. Billings. The Defendant believed that Investigator Robertson threatened Mr. Billings and manipulated him into testifying for the State because Mr. Billings was a convicted felon. The Defendant said it was possible that Investigator Robertson also threatened Ms. Gray. On redirect examination, the Defendant testified that he did not believe that Mr. Billings would testify in his favor due to Mr. Billings's status as a convicted felon.

The jury convicted the Defendant of unlawful possession of a firearm after previously been convicted of a felony involving the attempted use of force, violence, or a deadly weapon, a Class C felony. *See* T.C.A. § 39-17-1307(b)(1)(A), (2). Following a sentencing hearing, the trial court sentenced the Defendant to nine years to be served in confinement as a Range II, multiple offender.

## ANALYSIS

## I. MOTION TO SUPPRESS

The Defendant contends that the trial court erred in denying his motion to suppress the evidence resulting from the search of the truck because the officer did not have a search warrant and the Defendant was not engaged in illegal or suspicious conduct when operating the truck. The State responds that the stop was supported by reasonable suspicion. We agree with the State.

### A. Suppression Hearing

Investigator Groves offered testimony during the suppression hearing that was consistent with his testimony at trial, including the information in the BOLO that he received from the city dispatcher, his observation of the truck matching the description of the truck relayed in the BOLO, the circumstances of the seizure, and Officer Hamilton's observation of the gun in plain view. Investigator Groves explained that once a gun is viewed in a vehicle, the officer should distance the occupant from the gun to prevent the occupant from reaching for it. He stated that by the time he was notified that the BOLO had been canceled, officers already had approached the truck, seen the gun, and were in the process of getting the Defendant out of the truck.

On cross-examination, Investigator Groves testified that according to the arrest warrant that he prepared, the traffic stop occurred at approximately midnight. He noted that information in the arrest report listed the traffic stop as occurring at 11:51 p.m. and said that this time was possibly listed by the dispatcher.

- 6 -

Investigator Groves testified that according to the video of the stop from the dash camera in his patrol car, he first saw the truck in the Exxon parking lot at 11:49:41 p.m. He pulled in behind the truck to make the stop at 11:50 p.m. He stated that when he approached the Defendant on the driver's side, he had not learned that the BOLO had been canceled. Officer Hamilton signaled to Investigator Groves about seeing the gun in the truck at 11:51:11 p.m. Investigator Groves said he was not informed about the cancelation of the BOLO until after officers observed the gun in the truck.

On redirect examination, Investigator Groves testified that he had no way to compare the timing of the events discussed in the radio traffic to the time listed in the video of the stop. He stated that he was familiar with the Defendant's criminal history when he conducted the traffic stop. Investigator Groves also stated that prior to the encounter, he knew who the Defendant was and that he was a convicted felon. However, there is nothing to suggest that Investigator Groves recognized the Defendant prior to the stop.

On re-cross examination, Investigator Groves testified that he believed that he had encountered the Defendant on an occasion prior to the stop. Investigator Groves also received information about the Defendant's release from prison and his gang affiliation through a program called "Blue Impact."

Investigator Robertson testified that due to the amount of gang-involved shooting, the Jackson Police Department implemented a program called "Blue Impact" where different divisions of the police department shared information regarding various individuals and their criminal histories. Investigator Robertson believed that the Defendant was one of the individuals whose information was shared through "Blue Impact." According to Investigator Robertson, the Defendant, along with other members of the Vice Lords, was a suspect in the 2014 murder of a member of the Hoover Crips gang.

Investigator Robertson created a sequence of events regarding the traffic stop based on records from central dispatch. He testified that according to the records, the county dispatcher advised the city dispatcher of the BOLO at 11:43:43 p.m. The city dispatcher broadcast the BOLO of the officers from the Jackson Police Department at 11:45:04 p.m. At 11:49:30 p.m., Investigator Groves called central dispatch, reported seeing the truck leaving a gas station on East Chester Street, and stated that he would try to conduct a traffic stop. At 11:50:05 p.m., the county dispatcher called the city dispatcher to cancel the BOLO. While the county dispatcher was talking with the city dispatcher, Investigator Groves called at 11:50:08 p.m. and reported that he was stopping the truck. At 11:50:42 p.m., the city dispatcher broadcast over the radio to the city officers that the BOLO was canceled.

On cross-examination, Investigator Robertson testified that the dash camera on Investigator Groves's patrol car was not synced with the times listed in the dispatcher's records. He stated that as a result, there could be a discrepancy of a few seconds to a few minutes or there could be no discrepancy.

The Defendant presented the testimony of Mr. Kenneth Michael Bickerstaff, who owned a pallet shop on Lohrig Road in Madison County. Mr. Bickerstaff testified that on May 19, 2015, he learned that an employee intended to burglarize the shop. Mr. Bickerstaff waited at the shop to stop the burglary. At approximately 11:45 p.m., he saw a Caucasian female; Will Anderson, an African-American male; and Cody Mills, a Caucasian male, coming from a nearby wooded area. Mr. Bickerstaff fired a warning shot with his rifle, and the three people fled. Mr. Bickerstaff called 9-1-1 and gave the operator Mr. Anderson's name. He did not believe that he relayed to the operator any information about a truck and said he was unaware of the truck until after officers arrived at the scene.

Mr. Dekontee St. Clair, who lived nearby, testified that on May 19, 2015, he was lying in bed when he heard a gunshot. He looked outside, saw the silhouettes of several individuals running, and called the sheriff's department. Sergeant Karen Pomeroy of the Madison County Sheriff's Office apprehended the suspects after they crashed their vehicle.

At the conclusion of the hearing, the trial court denied the Defendant's suppression motion and found that the stop was based on reasonable suspicion. The trial court found that the truck driven by the Defendant match the description of the truck subject to the BOLO. The trial court credited Investigator Groves's testimony that by the time that the BOLO was canceled, the officers observed the firearm in plain view and were getting the Defendant out of the truck. The trial court found that Investigator Groves verified that the Defendant was a convicted felon. The trial court subsequently entered a written order incorporating its findings.

## B. Analysis

A trial court's factual findings made during a motion to suppress are binding on an appellate court unless the evidence preponderates against them. *State v. Saylor*, 117 S.W.3d 239, 244 (Tenn. 2003). Determinations of witness credibility and the resolution of conflicts in the evidence are left to the trial court. *State v. Riels*, 216 S.W.3d 737, 753 (Tenn. 2007). The prevailing party is entitled to the strongest legitimate view of the evidence and to all reasonable inferences drawn from the evidence. *State v. Day*, 263 S.W.3d 891, 900 (Tenn. 2008). A trial court's conclusions of law are reviewed de novo.

- 8 -

*State v. Sawyer*, 156 S.W.3d 531, 533 (Tenn. 2005). Likewise, a trial court's application of law to the facts is reviewed de novo. *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001).

The State argues in a footnote in its brief that the Defendant "probably" lacks standing to seek to suppress the handgun found in his grandfather's truck. However, the State did not raise the issue of standing in the trial court. Accordingly, the issue is waived. *See State v. Kale Sandusky*, No. M2010-02300-CCA-R3-CD, 2012 WL 405660, at *2 (Tenn. Crim. App. Feb. 8, 2012) ("The issue of standing cannot be raised for the first time on appeal and is waived if it is not previously raised in the trial court.") (citing *State v. Oody*, 823 S.W.2d 554, 560 (Tenn. Crim. App. 1991)).

Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution provide protection for individuals against unreasonable searches and seizures. *State v. Day*, 263 S.W.3d 891, 900-01 (Tenn. 2008). "[A] warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997).

"One exception to the warrant requirement exists when a police officer makes an investigatory stop based upon reasonable suspicion, supported by specific and articulable facts, that a criminal offense has been or is about to be committed." *State v. Binette*, 33 S.W.3d 215, 218 (Tenn. 2000). "The level of reasonable suspicion required to support an investigatory stop is lower than that required for probable cause." *Day*, 263 S.W.3d at 902. Reasonable suspicion is "a particularized and objective basis for suspecting the subject of a stop of criminal activity." *Binette*, 33 S.W.3d at 218. The reasonableness of the stop is assessed from an objective perspective. *Day*, 263 S.W.3d at 903. Courts should consider the totality of the circumstances surrounding the stop, which "includes, but is not limited to, objective observations, information obtained from other police officers or agencies, information obtained from citizens, and the pattern of operation of certain offenders." *State v. Bridges*, 963 S.W.2d 487, 492 (Tenn. 1997) (quoting *State v. Watkins*, 827 S.W.2d 293, 294 (Tenn. 1992)). "A court must also consider the rational inferences and deductions that a trained police officer may draw from the facts and circumstances known to him." *Watkins*, 827 S.W.2d at 294.

The Defendant argues that he was lawfully operating the truck prior to the stop and that the information included in the BOLO was insufficient to justify the stop. The State responds that the information provided in the BOLO established reasonable suspicion to justify the stop. We agree with the State.

"'[A]n alert or BOLO report may provide the reasonable suspicion necessary to justify an investigatory stop.'" *Davila v. United States*, 713 F.3d 248, 258 (5th Cir. 2013) (quoting *United States v. Rodriguez*, 564 F.3d 735, 742 (5th Cir. 2009)); *see also Dorsey v. Barber*, 517 F.3d 389, 396 (6th Cir. 2008) (recognizing that "[p]olice officers may rely on police bulletins or flyers to detain persons based on reasonable suspicion that criminal activity is afoot to whatever extent the bulletin itself was based on articulable facts that would support reasonable suspicion") (citations omitted).

In the present case, the BOLO alert described a white Chevrolet Silverado pickup truck occupied by an African-American male and a Caucasian male and suspected to have been involved in a robbery. The truck was described as traveling down East Chester Street into the city limits of Jackson from the Beech Bluff area. Within minutes of receiving the BOLO, Investigator Groves saw a truck matching that description in the area to which the BOLO described the truck as traveling. Investigator Groves was not notified that the BOLO was canceled until after he effectuated the stop and officers viewed the firearm in plain view. We conclude that the totality of the circumstances, including the fact that the truck matched the description of the truck subject to the BOLO, that the truck was near the area where the BOLO provided that the truck would be, that the officer viewed the truck within minutes of receiving the BOLO, and that the robbery had recently occurred, was sufficient to establish reasonable suspicion to conduct an investigatory stop to determine whether the occupant was involved in the reported robbery. Accordingly, the trial court properly denied the Defendant's motion to suppress evidence seized as a result of the stop.

## II. SUFFICIENCY OF THE EVIDENCE

The Defendant maintains that the evidence is insufficient to support his conviction for unlawful possession of a firearm after having been convicted of a felony involving the "attempted use of force, violence, or a deadly weapon." When a defendant challenges the sufficiency of the evidence, the relevant question for this court is "whether, after viewing the evidence in the light most favorable to the State, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "'the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Therefore, this court will not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Instead, it is the trier of fact, not this court, who resolves any questions concerning "the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

This court applies the same standard of review regardless of whether the conviction was predicated on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011). "Circumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012).

As charged in the indictment, Tennessee Code Annotated section 39-17-1307(b)(1)(A) provides that "[a] person commits an offense who unlawfully possesses a firearm" after having previously been convicted of a "felony involving the … attempted use of force, violence, or a deadly weapon." [1] Possession may be actual or constructive. *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001). "Constructive possession requires that a person knowingly have the power and the intention at a given time to exercise dominion and control over an object, either directly or through others." *State v. Copeland*, 677 S.W.2d 471, 476 (Tenn. Crim. App. 1984). Constructive possession of a firearm "may occur only where the personally unarmed participant has the power and ability to exercise control over the firearm." *Key v. State*, 563 S.W.2d 184, 188 (Tenn. 1978). "'Elements of possession for purposes of constructive possession are questions of fact for the jury and are rarely susceptible to direct proof.'" *State v. Gerald Dewayne Triplett*, No. W2015-00163-CCA-R3-CD, 2015 WL 9489506, at *5 (Tenn. Crim. App. Dec. 29, 2015) (quoting *State v. Ronald Killebrew*, No. W2003-02008-CCA-R3-CD, 2004 WL 1196098, at *3 (Tenn. Crim. App. May 26, 2004)).

The evidence presented in the present case established that the firearm was found in a truck that the Defendant was driving. The handle of the firearm was directed toward the Defendant and within his reach. While the Defendant testified at trial that the gun belonged to Mr. Billings, he told the police that he believed that the firearm belonged to his grandfather, and he stated during a telephone conversation while in the back of the patrol car that the gun belonged to a friend. The Defendant attempted to intimidate witnesses to prevent them from attending the trial. Accordingly, the jury chose not to credit the Defendant's testimony. Rather, the evidence, when viewed in a light most favorable to the State, establishes that the Defendant had the ability to exercise control over the firearm and was, thus, in constructive possession of the firearm.

---

[1] Although not raised as an issue on appeal, the indictment alleges that the Defendant was previously convicted of a felony involving the "attempted use of force, violence, or a deadly weapon," while the trial court instructed the jury that the element of the offense required a prior felony conviction involving the "use or attempted use of force, violence, or a deadly weapon."

The Defendant next contends that his prior conviction for facilitation of first degree murder is not a "felony involving the … attempted use of force, violence, or a deadly weapon." *See* T.C.A. § 39-17-1307(b)(1)(A). The State, however, responds that the issue is waived because the Defendant has failed to cite to any authority to support his argument. We find the State's argument perplexing as the Defendant quotes various statutes in his brief in support of his claim. We are equally perplexed by the State's argument that the Defendant waived the issue by failing to raise it in his motion for new trial as the Defendant clearly raised sufficiency of the evidence as an issue in his motion for new trial. Furthermore, sufficiency of the evidence need not be raised in a motion for new trial in order to preserve the issue for appeal. *See* Tenn. R. App. P. 13(e). Accordingly, we will address the Defendant's argument.

The only evidence presented by the State at trial to establish that the Defendant had been convicted of a prior felony involving the attempted use of force, violence, or a deadly weapon was the certified judgment of conviction. According to the certified judgment, the Defendant was originally charged with felony murder in the perpetration of aggravated robbery which occurred on April 24, 2000, and subsequently pled guilty to facilitation of first degree murder.

Tennessee Code Annotated section 39-17-1301(3) provides that "[c]rime of violence includes any degree of murder, voluntary manslaughter, aggravated rape, rape, especially aggravated robbery, aggravated robbery, burglary, aggravated assault or aggravated kidnapping." When a statutory definition provides that it "includes" specific items, our supreme court has held that the "'enumerated items are illustrative, not exclusive.'" *State v. Marshall*, 319 S.W.3d 558, 561 (Tenn. 2010) (quoting *Gragg v. Gragg*, 12 S.W.3d 412, 415 (Tenn. 2000)). Thus, while section 39-17-1301(3) lists various "crime[s] of violence," the list is not exclusive. Accordingly, we must consider whether facilitation of first degree murder constitutes a violent felony for purposes of Tennessee Code Annotated section 39-17-1307(b)(1)(A).

A defendant commits facilitation of a felony "if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the [defendant] knowingly furnishes substantial assistance in the commission of the felony." *Id.* § 39-11-403(a). Section 39-11-402(2) defines criminal responsibility for the conduct of another as "[a]cting with the intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." Thus, a defendant must know that an individual intended to commit a specified felony and the defendant must furnish substantial assistance to that individual without intending to promote or assist in the commission of the specified felony or benefit in the proceeds.

- 12 -

The facilitation statute itself does not include an element of violence, force, or the use of a deadly weapon. Nevertheless, the State "'*must prove the commission of a specified felony*'" to establish the offense of facilitation of a felony. *State v. Willie Lee Hughes, Jr.*, No. M2015-01688-CCA-R3-CD, 2106 WL 6956804, at *4 (Tenn. Crim. App. Nov. 29, 2016), *perm. app. denied* (Tenn. Feb. 16, 2017) (emphasis in original) (quoting *State v. Parker*, 932 S.W.2d 945, 951 (Tenn. Crim. App. 1996)); *see* T.C.A. § 39-11-403(a). In the present case, the underlying felony was first degree murder, which is clearly a violent felony. Accordingly, we conclude that facilitation of first degree murder is, likewise, a violent felony and that the evidence is sufficient to support the Defendant's conviction.

### III. SENTENCING

The Defendant maintains that his sentence is excessive. Specifically, he contends that the trial court erred in finding him to be a Range II, multiple offender, in not imposing the minimum sentence, and in ordering him to serve his sentence in confinement. The State responds that the trial court did not abuse its discretion in imposing the sentence. We agree with the State.

### A. Sentencing Hearing

During the sentencing hearing, the State presented the testimony of Ms. Susan Haney-Reagan, an employee with the Tennessee Department of Correction who prepared the presentence report regarding the Defendant. The State entered the presentence report into evidence.

On cross-examination, Ms. Haney-Reagan testified that the Defendant did not graduate from high school because he was incarcerated for a prior offense. The Defendant subsequently obtained his GED while he was in prison. Ms. Haney-Reagan noted that at the time of the Defendant's arrest in the present case, he was employed at Perseus. He also was working with a barber, "sort of like an apprenticeship."

The State argued that the Defendant should be sentenced as a Range II, multiple offender based upon his prior convictions for facilitation of first degree murder and attempted robbery. Although the offenses occurred on the same day, the State argued that convictions should be considered separate convictions pursuant to Tennessee Code Annotated section 40-35-106(b)(4) because the statutory elements included serious bodily injury, bodily injury, threatened serious bodily injury, or threatened bodily injury to the victim. According to the State, the Defendant received two misdemeanor convictions for simple possession of marijuana and harassment for offenses that occurred while the Defendant was released on bond for the current case. The State noted that the

- 13 -

Defendant's bond for the current offense was revoked based on his conduct relating to the harassment charge. At the time that the Defendant was taken into custody, the trial court ordered a drug screen, and the Defendant tested positive for marijuana, which the State argued constituted criminal behavior that the trial court could consider in sentencing the Defendant. The State also noted the evidence presented at trial that the Defendant threatened a witness in an effort to prevent the witness from attending the trial. Finally, the State requested that the trial court consider information in the presentence report that the Defendant incurred 106 rule infractions while incarcerated in the Department of Correction for his prior convictions.

Defense counsel argued that the Defendant was a Range I, standard offender because his prior convictions constituted a single course of conduct and should only be considered as one prior offense. Defense counsel requested that the trial court consider as a mitigating factor that the Defendant's conduct neither caused nor threatened serious bodily injury.

In imposing the sentence, the trial court stated that it considered the evidence presented at trial and during the sentencing hearing, the presentence report, the nature and characteristics of the criminal conduct, and the enhancing and mitigating factors. The trial court found that the Defendant was a Range II, multiple offender, noting that while the Defendant's prior convictions for facilitation of first degree murder and attempted robbery occurred on the same day, they constituted two separate convictions for determining the applicable range because the convictions included serious bodily injury, bodily injury, threatened serious bodily injury, or threatened bodily injury to the victim.

The trial court applied one enhancement factor, that the Defendant has "a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range." T.C.A. § 40-35-114(1). The trial court applied as a mitigating factor that the Defendant's conduct "neither caused nor threatened serious bodily injury." *Id.* § 40-35-113(1). The trial court sentenced the Defendant to nine years to be served in confinement as a Range II, multiple offender.

## B. Analysis

A trial court's sentencing decisions are generally reviewed for abuse of discretion, with a presumption of reasonableness granted to within-range sentences that reflect a proper application of the purposes and principles of sentencing. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the party complaining. *State v. Herron*, 461 S.W.3d 890, 904 (Tenn. 2015). The court

will uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. Even if the trial court "recognizes and enunciates several applicable mitigating factors, it does not abuse its discretion if it does not reduce the sentence from the maximum on the basis of those factors." *State v. Carter*, 254 S.W.3d 335, 345 (Tenn. 2008). The trial court is "to be guided by – but not bound by – any applicable enhancement or mitigating factors when adjusting the length of a sentence." *Bise*, 380 S.W.3d at 706. Further, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id*. A sentence imposed by the trial court that is within the appropriate range should be upheld "[s]o long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute." *Id*. The appealing party bears the burden of proving that the sentence was improper. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

In determining the sentence, the trial court must consider: (1) any evidence received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the applicable mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant wishes to make in the defendant's own behalf about sentencing. T.C.A. § 40-35-210(b). "The sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed," and "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." *Id*. § 40-35-103(4), (5).

## 1. Length of Sentence

The Defendant maintains that the trial court erred in sentencing him as a Range II, multiple offender. A multiple offender includes a defendant who has received "[a] minimum of two (2) but not more than four (4) prior felony convictions within the conviction class, a higher class, or within the next two (2) lower felony classes." T.C.A. § 40-35-106(a)(1). In determining prior convictions, "convictions for multiple felonies committed within the same twenty-four-hour period constitute one (1) conviction for the purpose of determining prior convictions" with the exception of "convictions for which the statutory elements include serious bodily injury, bodily injury, threatened serious bodily injury or threatened bodily injury to the victim or victims, or convictions for the offense of aggravated burglary." *Id*. § 40-35-106(b)(4).

The trial court based its finding that the Defendant was a Range II, multiple offender on the Defendant's prior convictions for facilitation of first degree murder, a Class A felony, and attempted robbery, a Class D felony. *See id.* §§ 39-11-117(a)(1), 39-11-403, 39-12-101, 39-13-401. The trial court found that although the offenses occurred on the same date, they were separate convictions for purposes of determining the applicable range because the statutory elements of the offenses included "serious bodily injury, bodily injury, threatened serious bodily injury or threatened bodily injury." *Id.* § 40-35-106(b)(4).

Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id.* § 39-13-401. This court has recognized that "the statutory elements of robbery include a threat of bodily injury when the State is required to prove that the defendant committed the act through violence or by putting the person in fear." *State v. Jamie Lynn Middlebrook*, No. M2009-02276-CCA-R3-CD, 2011 WL 198689, at *7 (Tenn. Crim. App. Jan. 11, 2011) (citing *State v. Iwanda Anita Buchanan*, No. M2007-02870-CCA-R3-CD, 2008 WL 4467185 (Tenn. Crim. App. Oct. 6, 2008)). As a result, an attempt to commit a robbery through violence or by putting a person in fear also includes a threat of bodily injury.

With regard to the Defendant's prior conviction for facilitation of first degree murder, this court has stated that although the facilitation statute does not include an element of actual or threatened bodily injury or serious bodily injury, the State must still prove the commission of a specific felony as an element of facilitation of a felony. *See Willie Lee Hughes, Jr.*, 2016 WL 6956804, at *4. Because first degree murder includes an element of serious bodily injury, facilitation of first degree murder includes such an element. *See id.* (holding the defendant's two prior convictions for facilitation of aggravated robbery that occurred within the same twenty-four-hour period should not be "merged" for purposes of determining the applicable sentencing range and reasoning that because aggravated robbery includes an element of at least threatened bodily injury, facilitation of aggravated robbery also includes such an element). Because both of the Defendant's prior convictions for attempted robbery and facilitation of first degree murder included an element of actual or threatened bodily injury or serious bodily injury, the trial court properly considered them to be separate convictions and found that the Defendant was a Range II multiple offender.

As a Range II, multiple offender convicted of a Class C felony, the Defendant's applicable range of sentence was six to ten years. T.C.A. § 40-35-112(b)(3). The trial court imposed a within-range sentence of nine years. In his brief, the Defendant states that he "believes that [the] record did not support a sentence over the minimum." The Defendant, however, fails to present any argument or authority to support his claim. He does not argue that the trial court misapplied the enhancement factor or failed to apply

any applicable mitigating factors. To the extent that the Defendant is challenging the trial court's weighing of the applicable enhancement and mitigating factors, under *Bise*, "mere disagreement with the trial court's weighing of the properly assigned enhancement and mitigating factors is no longer a ground for appeal." *Bise*, 380 S.W.3d at 706.

In sentencing the Defendant, the trial court considered the principles of sentencing, the nature and circumstances of the offense, and the applicable enhancing and mitigating factors. Accordingly, the trial court did not abuse its discretion in sentencing the Defendant to the within-range sentence of nine years.

### 2. Manner of Service

The Defendant asserts that the trial court erred in ordering him to serve his sentence in confinement. The Defendant, however, did not raise this argument during the sentencing hearing and did not support his claim in his brief with argument or any citation of authority. Nevertheless, we conclude that the trial court properly imposed a sentence of incarceration.

A defendant "who is an especially mitigated or standard offender convicted of a Class C, D, or E felony[ ] should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary." T.C.A. § 40-35-102(6)(A). Additionally, a defendant who receives a sentence of ten years or less may be eligible for probation. *Id*. § 40-35-303(a). However, the defendant bears the burden of establishing that he or she is a suitable candidate for probation. *Id*. § 40-35-303(b). "This burden includes demonstrating that probation will 'subserve the ends of justice and the best interest of both the public and the defendant.'" *Carter*, 254 S.W.3d at 347 (quoting *State v. Housewright*, 982 S.W.2d 354, 357 (Tenn. Crim. App. 1997)). In determining whether full probation is appropriate, the trial court "may consider the circumstances of the offense, the defendant's potential or lack of potential for rehabilitation, whether full probation will unduly depreciate the seriousness of the offense, and whether a sentence other than full probation would provide an effective deterrent to others likely to commit similar crimes." *State v. Boggs*, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996).

In determining whether incarceration is an appropriate sentence, the trial court should consider whether:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

- 17 -

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

T.C.A. § 40-35-103(1)(A)-(C). Additionally, the trial court should consider the defendant's potential or lack thereof for rehabilitation or treatment in determining whether an alternative sentence is warranted. *Id*. § 40-35-103(5). This court reviews the denial of an alternative sentence that falls within the appropriate range and reflects that the decision was based on the purposes and principles of sentencing under an "abuse of discretion standard, accompanied by a presumption of reasonableness." *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012).

The trial court did not make specific findings regarding the determinations set forth in Tennessee Code Annotated section 40-35-103(1)(A)-(C). Nevertheless, we conclude that the record supports the trial court's imposition of a sentence of confinement. As a Range II, multiple offender, the Defendant was not considered a favorable candidate for an alternative sentence. *See* T.C.A. § 40-35-106(6)(A). The Defendant has prior felony convictions for facilitation of first degree murder and attempted robbery for which he was sentenced to terms of incarceration. He incurred 106 rule infractions while incarcerated for these convictions. While released on bond for the firearm offense, he was charged with the misdemeanor offenses of harassment and simple possession of marijuana and later convicted of the offenses. After the Defendant's bond was revoked, he tested positive for marijuana. He then attempted to prevent witnesses for the State from attending the trial. Accordingly, "[c]onfinement is necessary to protect society by restraining [the Defendant] who has a long history of criminal conduct. *Id*. § 40-35-103(a)(A). The trial court properly sentenced the Defendant to a term of incarceration.

## CONCLUSION

Based on our review of the record and the applicable law, we affirm the judgment of the trial court. We note that the Defendant was convicted pursuant to Tennessee Code Annotated section 39-17-1307(b)(1)(A), but the judgment form reflects a conviction under section 39-17-1307(c). We accordingly remand for correction of the judgment form.

_____

JOHN EVERETT WILLIAMS, JUDGE